195 F.3d 134 (2nd Cir. 1999)
 Ray Gant, Jr., a minor, by his father and next friend, Ray Gant, Sr., Plaintiff-Appellant,
v.
Wallingford Board of Education; Barbara Beecher, Richard Centner, Phyllis Dechello, Mark Moynihan, Thomas Murphy, Valerie Nolan, Steve Pickering, John Wooding, Suzanne Wright, George Bozzi, Jr., Donna Lange, and Vincent Testa, in their official capacities; and Dr. Joseph Cirasuolo, Patricia Cronin, and Grace Candido, in their individual and official capacities, Defendants-Appellees.
 Docket No. 98-9467
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: August 12, 1999
Decided: November 09, 1999
 
 Appeal from a final judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, Judge), to the extent that it grants defendants' motion for summary judgment on plaintiff's race discrimination claims under 42 U.S.C. 1981 and 1983. The District Court, adopting the recommended ruling of Magistrate Judge William I. Garfinkel, determined that there was no genuine issue as to the material factual question of whether defendants intentionally discriminated against plaintiff on the basis of race through (1) deliberate indifference to racial hostility in his kindergarten and first-grade classes; or (2) a decision to transfer him, mid-year, from the first grade to kindergarten. The District Court concluded that, in the absence of a showing by plaintiff of a genuine issue as to intentional discrimination, defendants were entitled to judgment as a matter of law.
 Affirmed.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Laura Lee A. Dorflinger, Law Office of W. Martyn Philpot, Jr., L.L.C., New Haven, CT, for Plaintiff-Appellant.
 Peter A. Janus, Siegel, O'Connor, Schiff & Zangari, P.C., Hartford, CT, for Defendants-Appellees.
 Before: Calabresi, Cabranes, and Sotomayor, Circuit Judges.
 Judge Calabresi concurs in the judgment and in the majority opinion, and files a separate concurring opinion.
 Judge Sotomayor concurs in Parts I-III of the majority opinion, and files a separate opinion dissenting in part from Parts IV and V of the majority opinion.
 Jose A. Cabranes, Circuit Judge:
 
 
 1
 This appeal presents questions concerning the nature and extent of circumstantial evidence needed to permit a reasonable inference of intentional race discrimination by school officials against a six-year-old child. Plaintiff appeals from a final judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, Judge), to the extent that it grants defendants' motion for summary judgment on claims, brought under 42 U.S.C. 1981 and 1983, that they intentionally discriminated against plaintiff on the basis of race through (1) deliberate indifference to racial hostility in his kindergarten and first-grade classes; and (2) a decision to transfer him, mid-year, from the first grade to kindergarten. We affirm.
 
 
 2
 * Although we discuss the pertinent evidence in greater detail below, we begin with some brief background facts that are not in dispute.
 
 
 3
 This case involves the enrollment of Ray Gant, Jr. ("Ray Jr.") at Cook Hill Elementary School, a public school in Wallingford, Connecticut, during the four-month period from February 23 to June 23, 1993. Ray Jr. entered Cook Hill after his family moved to Wallingford from the neighboring town of Meriden, where he had been in the first grade. Cook Hill was the third of four different schools, in three different towns, that Ray Jr. attended during the 16-month period from June 1992 to September 1993. At Cook Hill, Ray Jr. was initially placed in a first-grade class; after approximately two weeks, however, he was transferred to a kindergarten class, which he attended from March 10, 1993 until the end of the school year.
 
 
 4
 At Cook Hill, Ray Jr. was the only African-American student in his first-grade class, and the student body of the entire school was roughly one-percent to two-percent African-American. During his four months at the school, Ray Jr. was subjected to racial name-calling by other children, and once, when Ray Jr. was riding the school bus, he was referred to as a "nigger" by a parent speaking to her son at a bus stop.
 
 
 5
 The school superintendent, after receiving complaints from the Gants in June 1993, investigated the kindergarten transfer and the racial insults. In a September 1993 memorandum to the Wallingford Board of Education, he concluded that (1) "[t]here is no persuasive evidence that supports the allegation that Ray was subjected to constant abuse of a racial nature at Cook Hill"; (2) "[a]ll available evidence indicates that Ray's transfer to a kindergarten class was appropriate"; and (3) "[t]here is no persuasive evidence to support any criticism of how any staff member at Cook Hill addressed this situation."
 
 
 6
 Ray Jr. and his parents commenced this lawsuit, in August 1994, in the United States District Court for the District of Connecticut. The complaint named as defendants the Wallingford Board of Education, 12 board members in their official capacities, and three other persons the first-grade teacher (Grace Candido), the school principal (Patricia Cronin), and the school superintendent (Dr. Joseph Cirasuolo) in their individual and official capacities. The complaint asserted various federal claims, under 42 U.S.C. 1981, 1983, 1985, and 1986, for race discrimination, denial of equal protection of the laws, and denial of due process of law. The complaint also asserted various state law claims for infliction of emotional distress and for violation of Conn. Gen. Stat. 10-15c, which prohibits discrimination in public schools.
 
 
 7
 Judge Alfred V. Covello, to whom the case originally was assigned, granted defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The District Court concluded that the complaint set forth only "naked assertions" of race discrimination and that plaintiffs, by attaching the above-referenced superintendent's memorandum to the complaint, accepted its conclusion of no wrongdoing by school officials. On appeal, we vacated the dismissal. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669 (2d Cir. 1995). We held that the complaint's specific allegations--that Ray Jr. had skill levels similar to other students in the first-grade class, that the transfer was motivated by a desire to allay known racial tension in the first-grade class, and that the transfer violated a school policy requiring parental consent amounted to more than "naked allegations." See id. at 673. We also determined that the attachment of the memorandum was meant only to demonstrate the superintendent's alleged ratification of actions by other defendants. See id. at 674-75.
 
 
 8
 On remand, plaintiffs amended the complaint so that the claims of Ray Jr., who lacks legal capacity to sue, were properly asserted by his father as his prochein ami that is, as his "next friend." Judge Covello then granted plaintiffs' motion for a change of venue to New Haven, Connecticut, and transferred the case to Judge Janet Bond Arterton. In March 1997, Judge Arterton issued a ruling (1) granting defendants' motion to dismiss the claims brought by Ray Jr.'s parents in their own behalf; (2) granting defendants' motion to dismiss Ray Jr.'s claims under 42 U.S.C. 1986 as time-barred; (3) denying defendants' motion to dismiss, for failure to allege an official policy or custom, Ray Jr.'s claims against the Board of Education under 42 U.S.C. 1983; and (4) denying without prejudice defendants' motion to dismiss, on qualified immunity grounds, the 1983 claims against defendants Candido, Cronin, and Cirasuolo in their individual capacities. That ruling is not challenged in this appeal.
 
 
 9
 After the close of discovery, defendants moved for summary judgment on all remaining claims. Pursuant to 28 U.S.C. 636(b)(1)(B), the motion was referred to Magistrate Judge William I. Garfinkel, who recommended that summary judgment be granted. After considering plaintiff's objections, the District Court adopted the recommendation as its own ruling. The recommendation adopted by the District Court accepted plaintiff's argument that school officials could be held liable for deliberate indifference to racial hostility, but "conclude[d] that the action taken by school officials in response to the known racial incidents was appropriate and did not approach the 'deliberate indifference' necessary to maintain an action." The ruling also stated that the summary judgment record revealed no basis for a reasonable conclusion that the kindergarten transfer was based on considerations of race, as opposed to, for example, Ray Jr.'s difficulties with the first-grade curriculum.
 
 
 10
 Judgment was entered accordingly, and this appeal followed.[1]
 
 II
 
 11
 We review de novo a district court's entry of summary judgment. See, e.g., Bogan v. Hodgkins, 166 F.3d 509, 511 (2d Cir. 1999). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In determining whether a genuine factual issue exists, courts must resolve all ambiguities and draw all inferences in favor of the non-movant. See id.
 
 
 12
 In order for plaintiff to prevail on his claims for violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. 1981,[2] proof of racially discriminatory intent is required.[3] See Cantanzaro v. Weiden, 188 F.3d 56, 64 (2d Cir. 1999) (citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977)); Albert v. Carovano, 851 F.2d 561, 571-72 (2d Cir. 1988) (citing General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982); Zemsky v. City of New York, 821 F.2d 148, 150 (2d Cir. 1987)). Accordingly, we will disturb the District Court's summary judgment only if the evidence in the record, when viewed in the light most favorable to plaintiff, is sufficient to create a genuine issue as to whether defendants acted with an intent or purpose to discriminate against Ray Jr. on the basis of race in (1) responding to racial hostility by other children or (2) transferring Ray Jr. to kindergarten.
 
 III
 
 13
 * In addressing the racial hostility claim, we must first decide when, if ever, schoolteachers, administrators, and boards of education can be held liable for race discrimination in violation of the Fourteenth Amendment and 1981 based on their responses to harassment, in the school environment, of a student by other children or parents. We agree with the parties and the District Court that, to succeed on a claim of this nature, a plaintiff must show deliberate indifference on the part of the defendants themselves.[4] See Murrell v. School Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999) (holding that schoolteachers, administrators, and school boards violate equal protection principles through deliberate indifference to sexual harassment of a student by another student); cf. Davis v. Monroe County Bd. of Educ., 119 S. Ct. 1661 (1999) (holding that, under Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq., a school that receives federal funds may be liable to a student for money damages if it is deliberately indifferent to sufficiently severe student- on-student sexual harassment). This is because, in cases of alleged student-on-student harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves. See Davis, 119 S. Ct. at 1671.[5]
 
 
 14
 Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances. See id. (holding that liability for damages under Title IX requires a showing of "deliberate indifference to known acts of harassment"); see also Gebser v. Lago Vista Indep. Sch. Dist., 118 S. Ct. 1989, 1997 (1998) (stating that the complaint did not state a valid claim under the Title IX deliberate indifference standard, because notice of inappropriate comments by a teacher during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"); cf. Farmer v. Brennan, 511 U.S. 825, 847 (1994) (holding that a prison official may be liable under the Eighth Amendment based on deliberate indifference to the safety of prisoners if he knows of, and responds unreasonably to, "a substantial risk of serious harm").[6] The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself. Thus, to establish a violation of the Equal Protection Clause or 1981, a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur. It is not necessary to prove that the defendant fully appreciated the harmful consequences of that discrimination, because deliberate indifference is not the same as action (or inaction) taken "maliciously or sadistically for the very purpose of causing harm." Farmer, 511 U.S. at 835 (internal quotation marks omitted). Instead, deliberate indifference can be found when the defendant's response to known discrimination "is clearly unreasonable in light of the known circumstances." Davis, 119 S. Ct. at 1674. The Supreme Court has pointedly reminded us, however, that this is "not a mere 'reasonableness' standard" that transforms every school disciplinary decision into a jury question. Id. "In an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . , could not identify a response as not 'clearly unreasonable' as a matter of law." Id.
 
 B
 
 15
 Having set forth the relevant legal principles, we now turn to the relevant evidence in the summary judgment record. We will address separately the evidence with respect to the first-grade teacher (Mrs. Candido), the school principal (Mrs. Cronin), and the remaining defendants.
 
 
 16
 * As noted above, Ray Jr. was in Mrs. Candido's first-grade class from February 23 to March 9, 1993. The teacher testified at her deposition that she never witnessed another student direct a racial slur toward Ray Jr. This assertion is undisputed, and, in fact, it is supported to some degree by Ray Jr.'s statement that he was never subject to name-calling inside the classroom. Accordingly, we must consider the question of what information Mrs. Candido learned from others.
 
 
 17
 The record reflects that Mrs. Candido was informed of an incident that occurred on February 26, a day that she was absent and replaced by a substitute teacher. On that day, an after- lunch recess period in Mrs. Candido's classroom was supervised by Lucy Silva, who taught in the adjacent classroom. According to Mrs. Silva, a cafeteria aide informed her that boys in Ray Jr.'s class had called him "black spot." Mrs. Silva told the boys that name-calling was inappropriate and instructed them to apologize to Ray Jr., which they did. She also told the boys that she would report the behavior to Mrs. Candido and Mrs. Cronin, the school principal. This account, however, differs substantially from those given by Mrs. Candido and Mrs. Cronin. According to them, Mrs. Silva herself overheard some children "say something about chocolate pudding," but Mrs. Silva did not know which child made the comment, did not know whether the comment referred to Ray Jr., and did not believe that the comment was heard by Ray Jr., who reportedly was sitting across the room at the time.
 
 
 18
 We are required to view this evidence in the light most favorable to the non-moving party, but, in this case, it is unclear which version of the February 26 incident is more favorable to plaintiff. We therefore assume, for purposes of defendants' summary judgment motion, that Mrs. Candido was informed of either (1) "black spot" name-calling that drew a reprimand from Mrs. Silva; or (2) a reference to "chocolate pudding" that was unattributable, possibly innocent, and likely unheard by Ray Jr. In any event, it is undisputed that Mrs. Candido took no direct responsive action. She testified at her deposition that, in her view, it would have caused more harm than good if she had attempted to discuss the incident with the entire class. Instead, she and Mrs. Cronin decided that, in these circumstances, the appropriate response was "to keep an open eye on" the situation. With respect to this single incident, the District Court concluded, and we agree, that there is no basis for a jury to find that Mrs. Candido's failure to respond directly was so clearly unreasonable as to amount to deliberate indifference.
 
 
 19
 Furthermore, the summary judgment record contains no evidence that Mrs. Candido knew of any racial name-calling other than the February 26 incident. Ray Jr. himself testified at the age of 11, more than four years after he attended the Cook Hill school that he was called "nigger" and "chocolate drop" by other children at the school.[7] Ray Jr. testified that on one occasion he complained to Mrs. Candido that "they're calling me names."[8] There is no evidence, however, that Ray Jr. indicated to Mrs. Candido that the name-calling was racial in nature. To the contrary, Ray Jr. testified: "I just said that they're calling me names."[9]
 
 
 20
 To be sure, it could be significant that, according to Ray Jr., Mrs. Candido responded to his one complaint by saying, "[W]e don't tell on other students."[10] Specifically, if the evidence supported a reasonable inference that Mrs. Candido made the "we don't tell" statement after she learned of the February 26 incident, then it might be permissible for a jury to conclude that the statement demonstrated deliberate indifference to racial name-calling.[11] We would then be faced with the significant question of whether deliberate indifference to a few instances of student-on-student racial name-calling is sufficient to be considered race discrimination in violation of constitutional and statutory equal protection principles. We do not reach that question here, however, because the evidence about the timing of the "we don't tell" statement is insufficient to support a reasonable finding of deliberate indifference to racial name-calling in this case.
 
 
 21
 Although neither the parties nor the District Court addressed this issue of timing, we independently searched the summary judgment record for relevant evidence. At his deposition, Ray Jr. testified about the timing of the name-calling as follows:
 
 
 22
 Q When did that first happen; do you remember?
 
 
 23
 A No.
 
 
 24
 . . . .
 
 
 25
 Q . . . . Do you remember how soon after you went into Mrs. Candido's class that this began to happen?
 
 
 26
 A When they first started doing it.
 
 
 27
 Q Do you remember like how many days you were in Mrs. Candido's class when this started happening to you?
 
 
 28
 A No.
 
 
 29
 Q Was it pretty soon when you were in her class or after a while?
 
 
 30
 A After a while.
 
 
 31
 Ray Jr.'s mother testified that the boy had come home from school, on "either the second or the third day" that he was there, and told her he had been called a "chocolate drop" by another child. Mrs. Gant also testified that Ray Jr. had told her of Mrs. Candido's "we don't tell" statement. Counsel then posed a question as to whether this occurred after the "chocolate drop" incident, but Mrs. Gant asked to have the question repeated, and it never was.
 
 
 32
 If plaintiff sought to rely on the timing of the "we don't tell" statement, he would be required to produce, in response to defendants' summary judgment motion, evidence sufficient for a jury to find that the statement was made after Mrs. Candido learned of the February 26 "black spot"/"chocolate pudding" incident. However, none of the evidence discussed above would support such a finding, and while we draw all reasonable inferences in favor of the non-moving party on a motion for summary judgment, we do not permit an issue to go to trial on the basis of mere speculation in favor of the party that bears the burden of proof. See, e.g., Darnet Realty Assocs., LLC v. 136 East 56th Street Owners, Inc., 153 F.3d 21, 23 (2d Cir. 1998). Furthermore, plaintiff has never claimed that the timing of the "we don't tell" statement is legally significant, much less that it demonstrates deliberate indifference. In fact, at oral argument, plaintiff's counsel stated her understanding that the statement was made before the February 26 incident.[12] See Tr. at 7-10. Accordingly, we conclude that the summary judgment record contains no evidence from which a jury could reasonably find deliberate indifference on the part of Mrs. Candido.
 
 2
 
 33
 As discussed above, the school principal, Mrs. Cronin, was also notified of the February 26 incident. However, she was informed either that the offending children had been reprimanded and had apologized or that the comment was unattributable, possibly innocent, and likely unheard by Ray Jr. In these circumstances, her lack of response other than the asserted understanding that Mrs. Candido would "keep an open eye on" the situation cannot give rise to a reasonable finding of deliberate indifference.
 
 
 34
 Mrs. Cronin also knew of a second incident, which occurred while Ray Jr. was riding the school bus in May 1993, about two months after he was transferred out of Mrs. Candido's class. At a bus stop, the driver overheard a mother say to her child "something to the effect that 'Oh you have to ride with a Nigger.'" The driver did not believe that Ray Jr. or any other child on the bus heard the comment, but it appears that Ray Jr. reported it to his mother. In any event, Mrs. Gant learned of the incident and, the following day, she informed Jane Romans, the teacher of the kindergarten class to which Ray Jr. had been transferred. Mrs. Romans was upset by the report, and she assured Mrs. Gant that she would speak to her class about it. After Mrs. Gant left, the teacher held "a class meeting on name-calling," in which the children were reminded of previous discussions "about[] people being different" and were told that any name-calling was unacceptable.
 
 
 35
 Mrs. Gant also discussed the bus incident with Mrs. Cronin, who later checked back with Mrs. Romans and learned about the class meeting. Other than checking with Mrs. Romans, however, Mrs. Cronin did not take any action in response to the incident. At her deposition, Mrs. Cronin explained this inaction as follows:
 
 
 36
 Q Did you think it appropriate to do anything concerning that comment? A I did not approve of the mother's comment. I do know this mother and this mother's history.
 
 
 37
 Q What does that mean?
 
 
 38
 A This mother is kind of brash, rude, ignorant, and I had dealt with her over the years.
 
 
 39
 Q Okay. Did you think it worthy of your office as principal of Cook Hill to reprimand, to warn, to instruct [the mother] to desist from any further such conduct or comments?A I do not have control of the neighborhood. I have control, if it was done on the bus, there are many ways that the situation could have been handled. It's like someone walking out here on the street, we don't control what they do or say.
 
 
 40
 In assessing this explanation, we are mindful of the Supreme Court's holding in Davis that one prerequisite to a school's liability for damages is that "the harasser is under the school's disciplinary authority." 119 S. Ct. at 1673. There is no question in this case that Mrs. Cronin was not responsible for disciplining the offender.[13] To be sure, the principal might not have been entirely powerless; perhaps, for example, she could have warned the offending parent that her son would not be permitted to ride the school bus if such an incident occurred again. The relevant inquiry, however, does not depend on whether one can plausibly "second guess[] the disciplinary decisions made by school administrators." Id. at 1674. We therefore agree with the District Court that, in light of the known circumstances, it was reasonable or, in any event, "not 'clearly unreasonable' as a matter of law," id. for Mrs. Cronin to be satisfied with the kindergarten teacher's response to the incident.
 
 
 41
 Mrs. Cronin testified that she was not aware of any other racial harassment of Ray Jr., and the summary judgment record contains no evidence to the contrary. Mrs. Gant testified that she spoke with Mrs. Cronin after Ray Jr. told her he had been called a "chocolate drop." However, the evidence is not clear as to whether the "chocolate drop" incident was distinct from the February 26 incident discussed above. More importantly, the evidence indicates that Mrs. Cronin believed Mrs. Gant was complaining about the February 26 incident. According to Mrs. Gant's own account, the principal responded to her complaint by stating that "she had gotten something from the substitute" about an incident of racial name-calling. Later in the deposition, Mrs. Gant again testified about having complained to Mrs. Cronin. The only reasonable inference to be drawn from the transcript, however, is that this testimony referred to the same conversation.
 
 
 42
 In sum, we conclude that plaintiff has failed to come forward with evidence from which a jury could reasonably find that Mrs. Cronin was aware of any racial name-calling other than the two incidents discussed above.[14] Because the circumstances surrounding those two incidents viewed both separately and together do not support a finding of deliberate indifference on the part of Mrs. Cronin, we hold that a jury could not reasonably find her liable on the racial hostility claim.
 
 3
 
 43
 As noted above, the school superintendent, Dr. Cirasuolo, issued a memorandum summarizing his investigation of the racial insults. He found that school personnel were aware only of the February 26 incident and the bus stop incident, and he concluded that criticism of the handling of these incidents was unwarranted.[15] In light of the evidence discussed above, a factfinder could not reasonably conclude that Dr. Cirasuolo's investigation and report reflect his own deliberate indifference to racial hostility. Similarly, neither the Board of Education nor its members may be found liable on this claim.
 
 
 44
 Accordingly, we affirm the District Court's entry of summary judgment in favor of all defendants on the racial hostility claim.
 
 IV
 
 45
 In assessing plaintiff's claims based on the kindergarten transfer, we borrow the burden- shifting framework of Title VII claims. See Howard v. Senkowski, 986 F.2d 24, 27 n.2 (2d Cir. 1993) (stating that the "analysis . . . developed in Title VII cases . . . is fully applicable to constitutional claims where the issue is whether an improper motive existed"). Under that framework, a plaintiff must first satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests with the plaintiff to prove that, despite the proffered nondiscriminatory reason, the defendant intentionally discriminated against the plaintiff here, on the basis of race. See, e.g., Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc).[16]
 
 
 46
 In this case, plaintiff sustains his minimal burden of making out a prima facie case by showing that, inter alia, Ray Jr. was transferred to kindergarten despite having been old enough for first grade and despite having formally completed kindergarten and more than half of the first grade in a different school district. Defendants sustain their burden of producing legitimate nondiscriminatory reasons: They assert that Ray Jr. was transferred from the first grade to kindergarten because he was academically "overplaced" in the first grade and was experiencing stress related to his difficulties with the work in Mrs. Candido's class. Accordingly, we will address whether the evidence in the summary judgment record could be sufficient for a reasonable jury to find that, despite defendants' proffered reasons, the kindergarten transfer decision actually represented intentional discrimination on the basis of Ray Jr.'s race.
 
 
 47
 The record reveals no genuine issue as to the fact that Ray Jr. was several months behind the average first-grader, especially in reading skills. Mrs. Candido testified that, during Ray Jr.'s first few days in her class, she observed intensifying signs of stress in his behavior during times such as reading period. Hoping to learn whether this behavior was "due to this new situation" or connected to "academic placement," Mrs. Candido asked the principal's office if the school had received Ray Jr.'s academic records from Meriden. After being informed that the records had not yet arrived, Mrs. Candido personally contacted Ray Jr.'s former first-grade teacher in Meriden, Mrs. Blakely, and learned "[h]ow Ray had done academically and behaviorally in her class," that he had been "having difficulty with reading" and that a"child study team" meeting had been scheduled but had not been held before the Gants moved to Wallingford. According to Mrs. Candido, she believed after 10 days that Ray Jr. was still adjusting to his new environment, but that he was also academically "overplaced" and "working at beyond peak." In her view, Ray Jr. was roughly three months behind the other students in the class.
 
 
 48
 To be sure, Ray Jr. testified at his deposition, taken when he was 11 years old, that the work in Mrs. Candido's first-grade class "was pretty easy" and that the teacher "was mean" to him insofar as "she used to make [him] shut [his] book and things like that" and "wouldn't call on [him]" when he raised his hand. And Mrs. Gant testified that, on the one occasion when she observed Mrs. Candido's class, the teacher instructed Ray Jr. to close his book when he persisted in asking for help. Quite apart from this ambiguous and unenlightening evidence, however, the record of Ray Jr.'s academic difficulties is overwhelming. It is true, as plaintiff points out, that in contrast to the evidence of Mrs. Candido's own assessment and her conversation with Mrs. Blakely, none of the evidence that we discuss below was available to defendants when the decision was made to transfer Ray Jr. from the first grade to kindergarten. Nevertheless, the evidence in the summary judgment record is significant, because it substantially reinforces Mrs. Candido's assertion that she believed Ray Jr. was "overplaced" in the first grade.[17]
 
 
 49
 The record shows that Ray Jr. attended kindergarten in West Haven, Connecticut, where he had a significant number of absences from school. At the end of the first of three marking periods, his teacher commented on his report card: "All the basic kindergarten skills are difficult for him. He requires constant supervision. At this time I am considering placing him in the transitional class." After the second marking period, the teacher commented: "Ray has learned many things during the last few months. He still does not possess the skills necessary to be at grade level." The report card in the summary judgment record bears no marks or comments for the final marking period, but Mrs. Gant conceded in her deposition that, if the family had not moved to Meriden during the summer, Ray Jr. would have been placed in a full-day "transitional" class instead of a first-grade class in West Haven.
 
 
 50
 Nevertheless, Ray Jr. was enrolled in the first grade in Meriden. He began roughly two weeks late, and had a significant number of additional absences throughout the year. At the end of the first of four marking periods, Ray Jr.'s teacher, Mrs. Blakely, believed that he "was still developing kindergarten skills necessary for first grade." In January 1993, after the end of the second marking period, Mrs. Blakely believed that Ray Jr. "probably possessed the kindergarten skills he needed to be successful in first grade had he been starting the first grade at that point." In other words, Mrs. Blakely believed that Ray Jr. had been in first grade for four months before he had the skills necessary to begin a successful year at that level. On February 1, 1993, just weeks before the events at issue here, Mrs. Blakely and Mrs. Gant agreed to refer Ray Jr. to a "child study team" comprised of the student's parents and teachers, the school principal, and various education specialists for the purpose of assessing whether Ray Jr. would benefit from further help at school. On February 10, Ray Jr. was withdrawn from school in Meriden, because the Gant family moved to Wallingford.
 
 
 51
 Ray Jr.'s experiences after he was transferred from first grade to kindergarten in Wallingford further corroborate Mrs. Candido's assessment that he was academically "overplaced" in the first grade. Mrs. Romans, who was Ray Jr.'s teacher after the transfer, testified that he "was slightly below the average" in terms of academic performance even at the kindergarten level. When the next academic year began in September 1993, Ray Jr. was enrolled as a first-grader in a different Wallingford elementary school the fourth elementary school that he had attended in the 16-month span since June 1992. His teacher reported that, in repeating the first grade, Ray Jr. was an average student. The accuracy of this assessment was supported by plaintiff's own expert, who reported that, near the middle of that school year, testing placed Ray Jr. at "a mid first grade level in reading and spelling." Finally, the record does not support plaintiff's claim that his other expert determined the kindergarten transfer "to be unjustifiable." That expert faulted the school for, in his view, failing to disclose an adequate justification for the transfer, but he expressly disclaimed having any opinion as to whether the decision was "justified" or not.
 
 
 52
 This evidence, even when viewed in the light most favorable to plaintiff, reveals no genuine issue as to the fact that Ray Jr.'s continuing academic difficulties justified the decision to transfer him out of the first grade. Indeed, most of plaintiff's evidence relates not to the fact that he was transferred out of first grade, but, instead, to the fact that he was transferred directly to kindergarten, instead of to the "transitional" class. During discovery, defendants were able to produce evidence of other mid-year transfers only for the 1996-1997 school year. That evidence revealed that two students were transferred from first grade to the transitional class; similarly, six students were transferred from kindergarten to "developmental kindergarten." Nothing in the record suggests that any student other than Ray Jr. was transferred, mid-year, back to a class level he or she already had formally completed.
 
 
 53
 The transfer decision was made after Mrs. Gant brought Ray Jr. into the classroom and expressed concern to Mrs. Candido about his reluctance to come to school. On that morning in early March 1993, around Ray Jr.'s tenth day at Cook Hill, he had been driven to school by Mrs. Gant, but, upon arrival, he began to cry and told her that he did not want to get out of the car. Mrs. Gant observed the class for about an hour, and conferred briefly with Mrs. Candido during a break in class. Mrs. Gant then went to speak with the principal, Mrs. Cronin.
 
 
 54
 According to Mrs. Cronin, she had previously spoken with Mrs. Candido on two occasions about Ray Jr.'s difficulties in the first-grade class. Mrs. Candido had told her about Ray Jr.'s "not being able to do the work that her other students were doing; that he was crying; that he was upset; that he couldn't do the work." In addition, from what Mrs. Candido had told her of the conversation with Ray Jr.'s former first-grade teacher in Meriden, Mrs. Cronin "got the idea . . . that he was having difficulty with the first grade curriculum" in the previous school as well.
 
 
 55
 Mrs. Cronin testified at her deposition that the transfer decision was "a joint decision with Mrs. Gant." According to Mrs. Cronin, she recommended the transfer but "all throughout [the conversation], I kept saying it was her [i.e., Mrs. Gant's] final choice, parents' final choice." She explained to Mrs. Gant that one option was for Ray Jr. to remain in first grade, but Mrs. Gant clearly agreed with the recommendation that he go back to kindergarten. Superintendent Cirasuolo testified at his deposition, however, that "Mrs. Cronin told me that she did not indicate to Mrs. Gant that she had a choice [as to whether Ray Jr. would be transferred to kindergarten]." And according to Mrs. Gant, she repeatedly told Mrs. Cronin that she did not want Ray Jr. to be transferred to kindergarten, but the only other option presented by Mrs. Cronin was for Ray Jr. to be transferred to a different school.
 
 
 56
 In any event, it is clear that Mrs. Cronin did not present Mrs. Gant with the option of placing Ray Jr. in the transitional class. According to Mrs. Cronin, Mrs. Gant told her that Mrs. Candido suggested he either stay in her class or possibly transfer to the transitional class.[18] Without consulting Ray Jr.'s teacher any further, Mrs. Cronin determined that the transitional class would be inappropriate. At her deposition, Mrs. Cronin first explained that, based on her own knowledge of the transitional class and her conversations with Mrs. Candido about Ray Jr., she believed that the transitional class "had reading skills that were beyond what Ray was doing at that point" and that "the transitional class was operating at a level above what Ray was operating at at that point." Later in the deposition, she testified:
 
 
 57
 Q And as far as your professional judgment was concerned, he was even beyond or beneath the transitional class reading level?
 
 
 58
 A I'm not saying beneath the transitional class. What I'm saying, I felt that was not appropriate.
 
 
 59
 Q Not appropriate. Why?
 
 
 60
 A Because I did not want to put Ray from one frustrating situation into another.[19]
 
 
 61
 According to Mrs. Gant, however, Mrs. Cronin told her simply that the transitional class was "full."
 
 
 62
 When viewed in the light most favorable to plaintiff, the evidence discussed above is arguably sufficient to support findings by a jury that (1) other children "overplaced" in the first grade were transferred mid-year to the transitional class; (2) no other child had been transferred mid- year to a class level he had already completed; (3) the putatively unusual decision in this case was made over the objections of the child's mother; (4) the decision was made based on information received from the classroom teacher, but without consulting the teacher and despite a belief that she recommended either retention in first grade or placement in the transitional class; and (5) two or three explanations were given for ruling out the transitional class.
 
 
 63
 Even assuming that the jury would make these subsidiary findings, however, they are insufficient to support an ultimate finding of race discrimination. As a general matter, race discrimination cannot reasonably be inferred merely from a finding that a decision amply supported by academic considerations and falling within the broad discretion of school officials affected a minority student and is open to second-guessing. And, in this case, plaintiff has not shown an ability to demonstrate anything more than that an arguably unusual yet indisputably discretionary decision was made in an arguably unclear manner. Consequently, it would be unreasonable for a jury to conclude in this case that, despite the clear academic justification for a transfer out of first grade, the decision to place Ray Jr. in kindergarten represented intentional discrimination on account of the child's race. We therefore affirm the District Court's entry of summary judgment for defendants on the kindergarten transfer claim.
 
 V
 
 64
 For the foregoing reasons, the judgment of the District Court is affirmed.
 
 
 65
 Calabresi, Circuit Judge, concurring from the majority opinion:
 
 
 66
 I concur in the majority's result and in its opinion. Although I think this is a very close case, in the end I agree that the record does not contain sufficient evidence to overcome a motion for summary judgment on any of Ray Jr.'s claims. I add a few words, however, because there is an aspect of both the Court's opinion and of Judge Sotomayor's dissent that though of no consequence to the resolution of this case, and hence in no way binding may, if not noted as problematical, be taken as a given and cause problems in later cases. Both opinions proceed as if Ray Jr.'s harassment claim and his claim of discrimination in the kindergarten transfer are completely separate and, at least legally, unrelated. Thus, the Court carefully and thoroughly analyzes the evidence for Ray Jr.'s claim of discrimination in the kindergarten demotion and then analyzes the evidence for Ray Jr.'s assertion that school officials were deliberately indifferent to the harassment he suffered at the hands of fellow students and their parents.
 
 
 67
 In its analysis of the deliberate indifference claim, the majority opinion does not mention the alleged discrimination in the demotion. This presents no problems for me because the Court finds (and I agree) that there is insufficient evidence of discrimination with respect to the demotion to overcome a motion for summary judgment. If, however, we had concluded that such evidence existed (if, in other words, the Court had adopted Judge Sotomayor's position on the kindergarten transfer claim), the situation would be quite different. In such a case i.e., where a school official commits, or knows of, a contemporaneous or otherwise related act of intentional discrimination against a student who is complaining of student-on-student harassment it would, I believe, be necessary to consider that act of discrimination as part of the Davis analysis to determine whether the response of school officials to the harassment was "clearly unreasonable in light of the known circumstances." Davis, 119 S. Ct. at 1674.
 
 
 68
 Were Mrs. Cronin, for example, to have intentionally discriminated against Ray Jr. in her kindergarten transfer decision (or, indeed, even to have known that someone else intentionally discriminated against Ray Jr. when making such a decision), and had that allegedly discriminatory action occurred in proximity to the harassing behavior that was the source of the Davis-type claim as in this case it clearly did that discriminatory action must, I think, be considered part of the "known circumstances" within which the reasonableness of Mrs. Cronin's response to the harassment is, under Davis, to be judged. If, therefore, I had agreed with Judge Sotomayor that there is sufficient evidence in the record for a reasonable finder of fact to conclude that Mrs. Cronin intentionally discriminated against Ray Jr. by demoting him to kindergarten, I would in deciding whether a jury was to be permitted to find that Mrs. Cronin's response to the harassment suffered by Ray Jr. was clearly unreasonable certainly have deemed that intentional discrimination to be part of the circumstances of which she must have been aware.
 
 
 69
 The two causes of action in this case are not hermetically sealed into different legal compartments. Rather, they arise from the same broad constellation of events, and what we think about one may very well have a determinative effect on what we think of the other. Because I conclude on the evidence before us and despite some intuitions to the contrary that, however, find no adequate grounding in the record that neither cause of action can survive summary judgment, I join the opinion of the Court.
 
 
 70
 Sotomayor, Circuit Judge, dissenting in part from the majority opinion:
 
 
 71
 I join the majority's decision to affirm summary judgment in favor of the defendants on Ray Gant's racial harassment claim because I do not believe the record contains sufficient evidence that the defendants acted with deliberate indifference. I also join the majority in affirming summary judgment in favor of Grace Candido on the kindergarten transfer claim, because she was not ultimately responsible for the decision to transfer Ray. I cannot agree, however, that summary judgment was appropriate with respect to the role of Patricia Cronin and, by extension, Dr. Cirasuolo and the school board in transferring Ray Gant from first grade to kindergarten.
 
 
 72
 Therefore, I respectfully dissent insofar as the majority affirms summary judgment in favor of Mrs. Cronin, Dr. Cirasuolo, and the school board defendants on the kindergarten transfer claim.
 
 
 73
 The majority apparently agrees that, given the "arguably unusual" nature of the transfer decision in this case, Ray succeeded in demonstrating pretext. See ante at 150. In my view, the majority's characterization does not go far enough. I consider the treatment this lone black child encountered during his brief time in Cook Hill's first grade to have been not merely "arguably unusual" or "indisputably discretionary," but unprecedented and contrary to the school's established policies. Viewed in the light most favorable to the plaintiff, the record indicates that every other Cook Hill student having academic difficulty received some form of transitional help, such as compensatory education, testing, or transitional classes. It further indicates that the school undertook these measures in consultation with the child's classroom teacher and with the consent of his parents. In Ray's case, however, Mrs. Cronin adhered to none of those procedures. Rather, she decided after nine days to transfer him into a grade he had already completed, over the objections of his parents and without consulting his teacher. Moreover, as the majority notes, Mrs. Cronin's own statements contradict one another as to why she undertook this kindergarten transfer rather than moving Ray to the "transitional class" between first grade and kindergarten. See ante at 149-50. Given these circumstances, a jury would be entirely justified in finding Mrs. Cronin's explanations for the transfer to be pretextual. See, e.g., Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (noting that departure from procedures may suggest pretext for discrimination); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (holding that conflicting explanations serve as evidence of pretext).
 
 
 74
 I also take issue with the majority's conclusion that although a jury might infer pretext from this evidence, Ray nonetheless failed to satisfy his burden of showing race discrimination. In Fisher v. Vassar College, 114 F.3d 1332 (2d Cir. 1997) (in banc), we stated that a finding of pretext does not relieve the plaintiff in a discrimination case of his burden of demonstrating that "'discrimination was the real reason'" for the adverse action. Id. at 1339 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). We emphasized, however, that "a prima facie case and a finding of pretext may in some cases powerfully show discrimination." Id. at 1338. In my view, this is such a case.
 
 
 75
 Ray presented significant evidence in support of his prima facie case, including the unprecedented nature of his transfer and the disparate treatment of similarly situated white students. In her deposition, for example, Mrs. Candido testified that two other students in Ray's first grade class at Cook Hill were receiving "compensatory education" to remedy their difficulties in reading, but that this option was never offered to Ray. The majority apparently considers this evidence insufficient to demonstrate that similarly situated white students were treated differently because Ray did not prove that he and the two other students were similar in any respect other than their common need for remedial reading instruction. In my view, however, this similarity is more than enough to satisfy the plaintiff's evidentiary burden on summary judgment. Although it may be the case that Ray's troubles were more serious than those of the other students, and that compensatory education thus would not have addressed his difficulties adequately, the burden of demonstrating such facts lies with the defendants and not with Ray. It is not the plaintiff's burden on summary judgment, when all inferences must be drawn in his favor, to show that he resembles members of the comparison group in every conceivable respect. Rather, once the plaintiff has adduced evidence to support a reasonable inference of similarity, as Ray did here, it is the defendant's burden to show that the plaintiff is in fact dissimilar in some relevant way. The defendants here failed to make this showing, leaving Ray with an unrebutted prima facie case on the issue of disparate treatment.
 
 
 76
 Viewed in the light most favorable to the plaintiff, this prima facie evidence, combined with the showing of pretext, fully supports the inference that race discrimination played a role i n Mrs. Cronin's transfer decision. Unlike in Fisher, where the finding of pretext "suggest[ed] numerous other possible unstated explanations no less likely than discrimination," id. at 1345, a finding of pretext here would strongly suggest that race discrimination was one factor motivating the transfer to kindergarten. The defendants in this case, unlike the defendant in Fisher, had no apparent non- racial reason such as "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility," id. at 1337 to cover up their true rationale for transferring Ray. Cf. Fisher v. Vassar College, 70 F.3d 1420, 1448 (2d Cir. 1995) (noting that the defendant's real motivation for denying tenure may have been plaintiff's period of absence from academia, and that this motivation might have exposed the defendant to liability on other grounds), aff'd in banc, 114 F.3d 1332 (2d Cir. 1997); cf. also Hollander v. American Cyanamid Co., 172 F.3d 192, 201-02 & n.5 (2d Cir. 1999) (noting that interpersonal friction, not age discrimination, may have been the real reason for plaintiff's termination). Only one circumstance in this case stands out as the likely reason for the discrepancy between the defendants' treatment of other struggling students and their treatment of Ray: his race.
 
 
 77
 The majority maintains that this circumstantial evidence is not enough for Ray's discrimination case to survive summary judgment. In so concluding, it seems to suggest that some additional, independent evidence of race discrimination beyond the evidence adduced in the prima facie case and the showing of pretext is necessary. However, "plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since '[a defendant] who discriminates is unlikely to leave a "smoking gun . . . ."'" Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998) (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)). Indeed, a plaintiff like Ray Gant will seldom be able to offer direct evidence of discrimination on the part of educators.
 
 
 78
 In my view, however, the circumstantial evidence Ray produced in meeting his prima facie and pretext burdens is easily sufficient to send the question of discrimination to the jury. Drawing all inferences in favor of the plaintiff, a jury might well conclude that Mrs. Cronin, confronted with a child whose academic difficulties were significant but not (at least in reading) necessarily worse than those of other students, jumped to the conclusion after only nine days that the student would not succeed in the first grade or in a transitional class, and that demotion to kindergarten was the only viable option. Although the majority characterizes this decision as "amply supported by academic considerations," ante at 149, many of those considerations arise in the form of after- acquired evidence evidence that does nothing to show that Mrs. Cronin, at the time she made the transfer decision, had enough information about Ray's capabilities to evaluate his placement adequately. Moreover, Mrs. Cronin made this decision despite having never taken such action with respect to a white child, despite the school's history of giving white students compensatory help, and without directly consulting the classroom teacher, who had suggested to Ray's mother that Ray receive such compensatory assistance and not that he be transferred to kindergarten. Mrs. Cronin also disregarded the recommendation from a prior teacher who, after spending nearly six months with Ray in her classroom, suggested not that he be moved back, but that he be evaluated by a child study team in order to determine what kind of compensatory help he required. Underlying this abrupt decisionmaking process, furthermore, was the crucial fact that Ray was the only black child in his classroom and one of the very few black students in the entire school.
 
 
 79
 Reading the record in this light, a jury reasonably could conclude that the school did not give the black student an equal chance to succeed (or fail). Contrary to the suggestion of the majority, such a conclusion would be based not "merely" on a finding that the events in this case were "unusual," but on the inference, drawn from substantial circumstantial evidence, that they were tainted by race discrimination. In my opinion, Ray was entitled to an equal opportunity to learn, and failing that a full hearing in court. Accordingly, insofar as the majority affirms summary judgment in favor of Mrs. Cronin, Dr. Cirasuolo, and the school board defendants on Ray's transfer claim, I dissent.
 
 
 
 Notes:
 
 
 [1]
 The District Court also granted defendants' motion for summary judgment with respect to claims based on an alleged conspiracy to deprive plaintiff of his constitutional rights, an alleged deprivation of procedural due process, and an alleged infliction of emotional distress. In this appeal, however, plaintiff presents questions that relate only to the race discrimination claims brought under 1981 and 1983; plaintiff no longer challenges the entry of summary judgment on the other claims.
 
 
 [2]
 As amended in 1991, the statute provides as follows:
 (a) Statement of equal rights
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 (b) "Make and enforce contracts" defined
 For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
 (c) Protection against impairment
 The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
 42 U.S.C. 1981.
 
 
 [3]
 Because discriminatory intent is central to both claims, our discussion below will not distinguish between them.
 
 
 [4]
 Because we conclude below that a jury could not reasonably find that school officials acted with deliberate indiffernece, we do not decide the standard under which the Wallingford Board of Education might be held liable for the deliberate indifference of its agents.
 
 
 [5]
 Although Davis involved claims of sex discrimination under Title IX, we conclude that its reasoning with respect to deliberate indiffernece is equally applicable here. We note, however, that there may be reason to believe that other aspects of the Davis holding are limited to the statutory context in which that case arose. For example, in Davis, the Supreme Court relied on statutory language in support of its conclusion that student-on-student harassment "can. . . rise to the level of discrimination" only wghen it "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 119 S. Ct. at 1674-75. Thus, the Court noted, a school may not be liable when the harassment consists of nothing more than "simple acts of teasing and name-calling among school children, . . . even where these comments target differences in gender." Id. We need not -- and do not -- decide whether mere name-calling is in sufficient in the equal protection setting as well, because, as discussed below, the summary judgment record in this case does not support a reasonable finding that defendants were deliberately indifferent to racially motivated name-calling.
 
 
 [6]
 It would be inappropriate to base f finding of discriminatory intent on a defendant's failure to respond to circumstances that wrd not actually known to him, even if he reasonably should have known. The Supreme Court has rejected the use of such an objective ("should have known") test for deliberate indifference in the Title IX context, see Davis, 119 S. Ct. at 1671; Gebser, 118 S. Ct. at 1996-99, as well as in the Eighth Amendment context, see Farmer, 511 U.S. at 837-41, and we decline to adopt such a test here. Of course, a showing that the defendant "should have known" can, in some circumstances, create an inference -- at least sufficient to raise a genuine issue -- that the defendant did know. See id. at 842.
 
 
 [7]
 It is unclear whether Ray Jr.'s "chocolate drop" allegation referred to the February 26 "black spot"/"chocolate pudding" incident. In general, Ray Jr.'s deposition testimony was vague:
 Q What king of names were students calling you?
 A They were calling me nigger and stuff.
 Q When did that first happen; do you remember?
 A No.
 Q Do you remember how many times it happened?
 A No.
 Q Was it once?
 A No.
 Q Was it more than once?
 A Yeah.
 Q Was it more than three times?
 A I don't rember, but it was more than once.
 Q Do you remember who called you these names?
 A No.
 Q Were they in your class? Were they in Mrs. Candido's class?
 A Mm-hmm.
 . . . .
 Q . . . Were there any other names that the kids called you besides the one that you told me about?
 A Yeah. They were always calling me stupid and like chocolate drop and stuff.
 Q When you say "always" calling you, how often did they do this?
 A I don't know. They were doing it, though.
 The vagueness of Ray Jr.'s testimony is not surprising given the obvious questions that arise when an 11-year-old child is asked to recall events from age six.
 
 
 [8]
 In addition, Ray Jr.'s mother testified at her deposition that she had complained of name-calling to Mrs. Cronin, the school principal, who told her, "I talked to Mrs. Candido, and she said nothing was done." As discussed below, even if this evidence is admissible against Mrs. Candido, there is no evidence to suggest that Mrs. Cronin's conversation with Mrs. Candido concerned any racial incident other than the one on February 26.
 
 
 [9]
 Plaintiff argues on appeal that "if there is any question about what names the plaintiff told Ms. Candido the other students called him, plaintiff should be afforded the reasonable inference that he specified the names." In light of Ray Jr.'s deposition testimony, however, we conclude that there is no basis for a reasonable conclusion that Ray Jr. informed Mrs. Candido of racial name-calling by other students.
 
 
 [10]
 The parties have submitted no deposition testimony from Mrs. Candido concerning this statement. The summary judgment record does contain a letter from Mrs. Candido to Superintendent Cirasuolo, in which Mrs. Candido states that "I did not tell Ray . . . that he should put up with name-calling." Even if this letter were admissible at trial, there would be a genuine issue as to whether the statement was made. Accordingly, for summary judgment purposes, we assume that Mrs. Candido did in fact make the "we don't tell" statement.
 
 
 [11]
 Of course, under even these circumstances, a jury could also reasonably conclude that the "we don't tell" statement resulted from negligence rather than purposeful race discrimination.
 
 
 [12]
 Plaintiff's counsel did state that Ray Jr.'s mother had complained directly to Mrs. Candido about racial name-calling. See Tr. at 11. The summary judgment record, however, does not support this assertion.
 
 
 [13]
 In this connection, it bears noting that Mrs. Gant filed a complaint against the other parent with the Town of Wallingford Police Department.
 
 
 [14]
 Of course, even if Mrs. Cronin had known of additional incidents in Mrs. Candido's classroom, she would not have been required to intervene directly, unless she also had clear evidence that the teacher was not responding appropriately to the situation. As a general rule, direct or supervening intervention by a supervisor is not the invariable response to an incident report in a subordinate's domain.
 
 
 [15]
 The report mentions a third incident that occurred while Ray jr. was in Mrs. Romans' kindergarten class. At his deposition, Dr. Cirasuolo explained that, in his report, Mrs. Gant's complaint about the bus stop incident had been mistakenly characterized as a complaint about a third occurence separate from that incident.
 
 
 [16]
 At oral argument, plaintiff's counsel maintained that the case should be analyzed under a "mixed-motives" framework. See Tr. at 11. Under that framework, "if the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged . . . decision, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision anyway." Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997); see also Howard, 986 F.2d at 27-28 (holding that mixed-motives analysis may apply to equal protection claims). This burden shift is warranted, however, only if the plaintiff "produces a smoking gun or at least a thick cloud of smoke" -- for example, "evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude." Raskin, 125 F.3d at 60-61 (emphasis in orginal) (internal quotation marks omitted). Where, as here, the plaintiff fails to produce any such evidence, the plaintiffcannot withstand a motion for summary judgment by arguing that a jury might reasonably find in his favor under the mixed-motives framework. See id. (affirming summary judgment).
 
 
 [17]
 In McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 359-60, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995), the Supreme Court held that an employer cannot escape liablility under the Age Discrimination in Employment Act based on evidence of the plaintiff's misconduct that would have justified her termination in any event, when the employer discovered such evidence after it had fired the plaintiff for discriminatory reasons. As the Supreme Court reasoned, " proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made." Id. at 360 (internal quotation marks omitted) (ellipsis in original).
 In contrast to the defendant in McKennon, defendants here do not rely on the after-acquired evidence of Ray Jr.'s academic difficulties to demonstrate that they would have transferred Ray Jr. to kindergarten in any event. Instead, they rely on the after-acquired evidence to demonstrate that Mrs. Candido's contemporaneous assessment of Ray Jr. as academically "overplaced" was accurate. When a factfinder considers whether a fefendant's asserted nondiscrimatory reason was a true basis for its decision, whether the asserted nondiscrimiatory reason was a true basis for its decision, whether the asserted nondiscriminatory reason was true at all is highly relevant.
 
 
 [18]
 According to Mrs. Gant, she was advised by Mrs. Candido to take Ray Jr. out of school for the remainder of the academic year and re-enroll him in first grade the next fall, and she (Mrs. Gant) independently raised with Mrs. CVronin the possibility of a transitional class. However, Mrs. Cronin's version of events is actually more favorable to plaintiff, because it suggests she was aware of a belief by Mrs. Candido that the transitional class, and not kindergarten, was the appropriate placement for Ray Jr. For summary judgment purposes, therefore, we assume that a jury would find Mrs. Cronin's version more accurate.
 
 
 [19]
 Mrs. Cronin also cited Ray Jr.'s "severe stress" as a reason for not pursuing the option of a "compensatory teacher," which had been provided to two other children in Mrs. Candido's class at the beginning of the year.