10-4304-cv
DiStiso ex rel. DiStiso v. Cook

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2011

(Submitted: October 7, 2011      Decided: August 21, 2012)

Docket No. 10-4304-cv

ROBIN DISTISO, as next friend of NICHOLAS DISTISO, a minor,
*Plaintiff-Appellee*,

—v.—

JOHN COOK, JACQUELYN UCCELLO, and TAMMY COUTURE,
*Defendants-Appellants.*[*]

Before:
MCLAUGHLIN, POOLER, and RAGGI, *Circuit Judges*.

Defendants, an elementary school principal and two teachers, appeal from a denial of summary judgment by the United States District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*) on defendants' claims that qualified immunity shields them from suit for alleged deliberate indifference to kindergarten and first-grade students' racial harassment of a classmate in violation of the Equal Protection Clause.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

Judge Pooler concurs in part and dissents in part in a separate opinion.

---

[*] The Clerk of Court is directed to amend the official caption as shown above.

1

Johanna G. Zelman and Michael J. Rose, Rose Kallor, LLP, Hartford, Connecticut, *for* Defendants-Appellants.

William S. Palmieri, Law Offices of William S. Palmieri, LLC, New Haven, Connecticut, *for* Plaintiff-Appellee.

REENA RAGGI, *Circuit Judge*:

Plaintiff Robin DiStiso, on behalf of her biracial son Nicholas, sued the Town of Wolcott, Connecticut, its Board of Education, and various named educators and administrators in Connecticut Superior Court under 42 U.S.C. §§ 1981 and 1983 and Connecticut law for alleged discrimination in connection with the child's enrollment in the kindergarten and first-grade classes at Wakelee public elementary school. Defendants removed the action to the United States District Court for the District of Connecticut, which dismissed many of plaintiff's claims, including a claim that defendants' efforts to place Nicholas in special education programs were racially motivated; a claim against the superintendent of schools, see DiStiso *ex rel*. DiStiso v. Town of Wolcott, No. 05-CV-1910 (PCD), 2006 WL 3355174 (D. Conn. Nov. 17, 2006); and claims against the town and the school board pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), see DiStiso *ex rel*. DiStiso v. Town of Wolcott, 539 F. Supp. 2d 562 (D. Conn. 2008). Other claims await trial, notably, for purposes of this appeal, § 1983 claims that Wakelee principal

2

John Cook, kindergarten teacher Jacquelyn Uccello,[1] and first-grade teacher Tammy Couture (hereinafter "defendants") violated the Equal Protection Clause by their deliberate indifference to students' racial harassment of Nicholas. Defendants sought summary judgment, arguing that qualified immunity shields them from these deliberate indifference claims. The district court has twice ruled otherwise.

On defendants' appeal from Judge Vanessa L. Bryant's initial rejection of their qualified immunity defense, see id., this court vacated the denial of summary judgment and remanded the case to afford the district court an opportunity to reconsider the defense in light of the intervening Supreme Court decision in Pearson v. Callahan, 555 U.S. 223 (2009); this court's decision in Gant *ex rel*. Gant v. Wallingford Board of Education, 195 F.3d 134 (2d Cir. 1999); and the command in Saucier v. Katz, 533 U.S. 194 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, that qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition," id. at 201. See DiStiso *ex rel*. DiStiso v. Town of Wolcott, 352 F. App'x 478, 481–82 (2d Cir. 2009) (summary order) (internal quotation marks omitted). Defendants now appeal from the district court's decision on remand again denying them summary judgment on the ground of qualified immunity. See DiStiso *ex rel*. DiStiso v. Town of Wolcott, 750 F. Supp. 2d 425 (D. Conn. 2010).

For the reasons stated in this opinion, we affirm the denial of summary judgment as

---

[1] At the time in question, Uccello went by her maiden name, Jacquelyn Tedeschi. In this opinion, however, we refer to her by her married name, in which she is sued.

3

to claims that defendants Uccello and Cook were deliberately indifferent to racial name-calling by kindergarten students, which in one instance may have been accompanied by a physical assault on Nicholas. We reverse the denial, however, as to claims that defendants were deliberately indifferent to all other allegedly racially motivated physical misbehavior by kindergarten and first-grade students. Clearly established law requires defendants to have had actual knowledge that the misbehavior, which was commonplace for such young children, was racially motivated to hold them liable for a denial of equal protection based on a theory of deliberate indifference. The record evidence, even as construed by the district court and viewed in the light most favorable to plaintiff, cannot support a finding of such actual, as opposed to imputed, knowledge.

## I.    **Background**

### A.    The Deliberate Indifference Claim

Robin DiStiso contends that from the time five-year-old Nicholas entered Jacquelyn Uccello's kindergarten class at the Wakelee school in late August or early September 2002, through March 2004, when Mrs. DiStiso and her husband Philip withdrew their son from defendant Tammy Couture's first-grade class at Wakelee, the child was subjected to persistent racial harassment by his classmates in the form of name-calling and physical misbehavior. Plaintiff maintains that defendants were made aware of this racial harassment but were deliberately indifferent to it, thereby allowing it to continue. Indeed, plaintiff asserts that the three defendants' indifference was informed by their own racial bias, as evidenced by Uccello substituting a brown crayon for a yellow one that Nicholas had been

4

using when coloring a picture intended to depict himself, Couture pulling and dragging the child to principal John Cook's office after he refused her order to report there, and defendant Cook failing to address racial bigotry at a high school where he had previously served as principal.[2]

While defendants dispute these allegations, a court reviewing a motion for summary judgment must view the evidence in the light most favorable to plaintiff and draw all reasonable inferences in her favor. See Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010). The rule is, however, subject to certain caveats. A court cannot credit a plaintiff's merely speculative or conclusory assertions. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). Further, where a party relies on affidavits or deposition testimony to establish facts, the statements "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see Fed. R. Evid. 602.

The latter requirement is noteworthy here because, as we recognized in our earlier decision, Nicholas's deposition, taken when the child was eight years old about events occurring when he was five and six, indicates that the boy has only a limited recollection of

---

[2] Plaintiff also claimed that defendants' racial bigotry was evidenced by their efforts to place Nicholas in special education programs, but that claim having been resolved in favor of defendants at the motion to dismiss stage, we need not discuss the facts pertaining to it further. See DiStiso *ex rel.* DiStiso v. Town of Wolcott, 2006 WL 3355174, at \*4 (finding that, as result of failure to exhaust Individuals with Disabilities Education Act ("IDEA") remedies, "Plaintiff's claims which are based on conduct pursuant to the Defendants' obligations under the IDEA cannot stand, even if they are claims for relief not provided by the IDEA").

the alleged harassment to which defendants were purportedly indifferent. See DiStiso *ex rel.* Distiso v. Town of Wolcott, 352 F. App'x at 479 (observing that "Nicholas repeatedly testified that he did not remember or that he remembered only what he practiced with his mother the previous day in preparation for the deposition"). While his parents, at their depositions, testified to various occasions when their son came home from school complaining of racial name-calling and physical misbehavior, they have no personal knowledge of what occurred and, thus, appear competent to testify only to the fact of Nicholas's complaints, not to their truth. The DiStisos are, of course, competent to testify to personal observations of their son's condition upon return from school and to their subsequent interactions with defendants.

In moving for summary judgment, defendants questioned the admissibility of much of the DiStisos' testimony. See, e.g., Uccello's Mem. in Supp. of Summ. J. at 10, DiStiso *ex rel.* DiStiso v. Town of Wolcott, No. 05-CV-1910 (VLB) (D. Conn. Jan. 22, 2007), ECF No. 53-2. The district court did not address this evidentiary issue in its denial decision, leaving unclear whether it was (1) tacitly ruling in favor of plaintiff on all such disputes, or (2) reserving them for later resolution at trial. No matter. On interlocutory appeal of a qualified immunity denial, we do not review questions of "evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial." Johnson v. Jones, 515 U.S. 304, 313 (1995) (internal quotation marks omitted); accord Behrens v. Pelletier, 516 U.S. 299, 313 (1996); Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). Thus, whatever reservations we may have as to the ultimate admissibility of the DiStisos' hearsay accounts of certain events, for

6

purposes of this appeal, we must accept the record evidence as characterized by the district court.[3]

Mindful of these principles, we set forth the evidence in support of plaintiff's deliberate indifference claim by reference to its source.

    1.    Nicholas's Recollections

    a.    Racial Name-Calling

At his deposition, Nicholas testified that "[m]ean kids" at Wakelee called him "bad names" including "[b]lackie" and "nigger," the latter referred to by Nicholas as the "N word." N. DiStiso Dep. Tr. at 49–50, 52. The child could not remember the circumstances under which he was called these names or the frequency with which he was called them. Nor could he identify any child who had used such racial epithets. Indeed, he ascribed even his limited recollection of the name-calling to a recent conversation with his mother.[4]

---

[3] Nothing in this opinion is intended to preclude defendants from pursuing their evidentiary challenge on remand.

[4] The deposition transcript reports the following exchange:

 Q.    . . . Do you remember the day that somebody said the N word to you, or are you remembering what your mom said to you yesterday?

 A.    Yeah, what my mom said to me yesterday.

 Q.    Okay. You don't remember when somebody called you the N word, do you?

 A.    No.
  . . .
 Q.    . . . Do you really remember somebody calling you that name, Blackie,

7

b.      Physical Misbehavior

Nicholas testified that "[m]ean kids" at Wakelee had punched, pinched, and hit him while they were playing, but again he could not recall the name of any child who did so. Id. at 50–52. Nicholas also testified that classmates had thrown juice boxes at him, but he was unable to recall the circumstances or participants.[5] Notably, Nicholas did not testify that any of this physical misbehavior was in conjunction with or somehow linked to references to his race.

c.      The Uccello Crayon Incident

---

or is it that you're remembering what your mom told you yesterday?

A.      I remember what my mom told me.

Q.      Okay.  You don't remember what happened that day that somebody called you Blackie, do you?

A.      No.

Q.      You don't even remember who said it, do you?

A.      No.

Q.      You don't know where you were, do you?  Do you know where you were when that happened?  It's okay if you don't.

A.      I don't remember.

Id. at 53–54.

[5] Although Nicholas initially identified "Justin" as a "mean kid" who had thrown a juice box at him, N. DiStiso Dep. Tr. at 58, he quickly corrected himself, stating that he did not remember if Justin threw a juice box at him, but that he did recall Justin stepping on his (i.e., Nicholas's) feet.

8

Nicholas testified that his kindergarten teacher, Uccello—whom he referred to by her maiden name, "Ms. Tedeschi"—was a "mean lady,"[6] who had given him the "wrong crayon," "[a] brown crayon," when he had been using a yellow crayon to color a figure that was supposed to be himself. Id. at 18–21. Asked whether he remembered anything further, the child replied, "No," and acknowledged that his mother had helped to remind him about the incident. Id. at 22. Nicholas and his family did not complain about this incident to Uccello or to anyone else at the school.

---

[6] Nicholas would subsequently testify that his mother told him that Cook, Couture, and Uccello were mean:

> Q.    . . . Do you remember a man named Mr. Cook?
>
> A.    Yeah.
>
> Q.    Okay.  Who is he?
> . . .
> A.    A mean principal.
>
> Q.    He's a mean principal.  Who told you he's a mean principal?
>
> A.    My mom.
>
> Q.    Your mom did.  Did your mom tell you Ms. Couture was a mean teacher, too?
>
> A.    Yeah.
>
> Q.    Yeah.  And did your mom tell you that Ms. Tedeschi [i.e., Uccello] was a mean teacher, too?
>
> A.    Yeah.

N. DiStiso Dep. Tr. at 26.

9

d.    The Couture Pulling/Dragging Incident

When asked if his first-grade teacher, Couture, had done anything "mean" to him, Nicholas replied that she had pulled him out of his chair, causing him to hit his leg on the desk. Id. at 23. She then dragged him across the floor and took him to Cook's office. Nicholas stated that he did not remember anything more about the incident and that his mother had told him about it the previous day and gone over his answer with him. Nevertheless, Nicholas subsequently clarified that he had an independent recollection of Couture's actions even before the discussion with his mother refreshed his memory.

2.    Mrs. DiStiso's Recollections

a.    Nicholas's Complaints

At her own deposition, Mrs. DiStiso testified that when Nicholas entered kindergarten in late August or early September 2002, he "was the only black kid in his class." R. DiStiso Dep. Tr. at 72. Within two weeks, he began to complain to his parents almost daily of physical misbehavior by classmates, including pinching, biting, spitting, kicking, punching, hitting, and throwing juice boxes. Such complaints continued through first grade.

Mrs. DiStiso testified that Nicholas also complained of his classmates using racial epithets. Her testimony as to when she first became aware of such racial name-calling and the circumstances giving rise to the name-calling is not entirely clear. At one point, Mrs. DiStiso dated her first awareness to within a month or two of the school year, when Nicholas asked her what the word "nigger" meant and why classmates had called him that. Because Nicholas seemed more "curious" than "upset" at the time, Mrs. DiStiso told him simply that

10

it was "a not nice word" that "sometimes kids use," that she had experienced its use when she was in school, and that he should ignore such name-calling. Id. at 122–24. Earlier in her testimony, however, Mrs. DiStiso had indicated that she had learned of racial name-calling the first week of September 2002 and in quite different circumstances. She recounted Nicholas telling her that, while he was waiting with other children to wash his hands, a little girl had "slapped him in the face" and "at the same time" called him "the N word." Id. at 100–02. Still earlier in her testimony, Mrs. DiStiso had indicated that the girl had slapped Nicholas without saying anything. For purposes of this appeal, we assume a jury would resolve any testimonial discrepancies in favor of plaintiff.

Mrs. DiStiso further testified that the racial name-calling "kept going" for the first month or six weeks of Nicholas's kindergarten year. Id. at 161. She herself heard a racial epithet used at a birthday party off school grounds, when two boys bumped into Nicholas and one said "that kid is a nigger." Id. at 146. She testified that the boy who used the word at the birthday party was "the same kid who called [Nicholas] that in the classroom," although she could not recall the child's name. Id. at 149. She did not report the birthday party incident to anyone at the school.

Some months into the school year, Nicholas also reported to his mother that children had called him "blacky." Id. at 124. Further, on two unspecified occasions, Nicholas told Mrs. DiStiso that, while washing their hands, classmates had asked him why his hands were "still dirty after you wash them." Id. at 130.

11

Mrs. DiStiso did not testify to any occasions when her son complained of the use of racial epithets while in first grade.

### b. Mrs. DiStiso's Complaints

### (1) Kindergarten

Mrs. DiStiso testified that the day after Nicholas was slapped and called "nigger," i.e., during the first week of September 2002, she reported the occurrence to Uccello, who promised that she would speak to the student involved.[7]

A month later, in a note dated October 4, Mrs. DiStiso advised Uccello that Nicholas had come home complaining about a boy pinching him. The note made no mention of possible racial motivation.[8] That same day, Uccello replied that she had seen the incident,

---

[7] Uccello maintains that Mrs. DiStiso never told her that Nicholas's classmates were harassing him based on his race. She acknowledges speaking with Mrs. DiStiso in the first week of September 2002, but attests that she, i.e., Uccello, initiated the contact by telephone in order to discuss with Mrs. DiStiso concerns about Nicholas's behavior and academic comprehension. While Mrs. DiStiso denies this conversation, Uccello's account finds some support in a September 6 letter from Mrs. DiStiso to the teacher, which makes no mention of student harassment, racial or otherwise, but, rather, states in its entirety as follows:

> I was really concern about what you said about Nicholas yesterday so, I sat down with him and went over the problem. I think he got it now. My kids are my first priority so if Nicholas is having any other problem in class, please let me know, so I can go over it with him. Thank you.

R. DiStiso Letter, Sept. 6, 2002. Nevertheless, for purposes of this appeal, we assume that a jury would credit Mrs. DiStiso's testimony that she met with Uccello in person in early September and told her about a female student slapping Nicholas and simultaneously using a racial epithet.

[8] See R. DiStiso Letter, Oct. 4, 2002 ("Nicky came home yesterday crying and he said that Justin was pinching his legs. Nicholas said he did it about 5 times, and it hurt.").

which involved mutual misbehavior by the two kindergartners, and had handled it by admonishing both boys.[9] Mrs. DiStiso replied in a note that questioned Uccello's failure to intervene sooner but, again, offered no suggestion of possible racial motivation.[10]

Mrs. DiStiso testified that throughout the kindergarten year, she frequently wrote to Uccello complaining about name-calling by Nicholas's classmates. Mrs. DiStiso acknowledged that she made no mention therein of the specific names Nicholas was being called. Nor did she indicate that any of the names were racially disparaging.[11] Nevertheless, she testified that "a couple of times," when speaking with Uccello in person, she did tell the

---

[9] See Uccello Letter, Oct. 4, 2002 ("Actually, what happened yesterday was just a quick tiff between the two boys. It started by Nicholas stepping on Justins foot, and Justin's reaction was to pinch him. I witnessed the whole thing and spoke with both boys about keeping their hands and feet to themselves. I also explained that if someone does something that upsets you, you need to use your words and tell the teacher. Thanks for your concern.").
Defendants have produced other contemporaneous reports of Nicholas's purported misbehavior in kindergarten and first grade. See, e.g., Uccello Report, Sept. 11, 2002 ("Nicholas was sent to the office b/c he was 'pretending to shoot' his classmates. He was spoken to twice and then proceeded to attempt to slap the other children. Mr. Cook spoke to parents. They came in and took Nick home."). We hereafter reference such reports only where they provide background context to communications between the parties relevant to plaintiff's claims of deliberate indifference to student-on-student racial harassment.

[10] See R. DiStiso Letter, undated ("[G]oing back to what happened on Thursday of last week, when I told you that Nicky came home crying, said that Justin pinch about 5 times, you told me in the letter that you saw the whole thing. Why did you wait until the boy pinch Nicky, Why didn't you stop it before all that happen. I'm not trying to be a pain but that's seems like common sense to me.").

[11] See R. DiStiso Dep. Tr. at 242 ("[In] all of my letters I didn't put niggers, black, I didn't put no racials in there. I just put down he was teased because I feel that I didn't have to—I didn't want to put that in there.").

13

teacher that children had called Nicholas "blacky, nigger, [and] dirty hands." Id. at 136–37;[12]

see also id. at 145 (indicating that Mrs. DiStiso spoke with Uccello outside the classroom "about two" times).

Mrs. DiStiso testified that she also complained to Cook about her son being subjected to verbal and physical taunts, speaking to him once by telephone and then leaving "two or three answering machine[]" messages. Id. at 158. She did not testify that she ever told Cook that the name-calling involved racial epithets.[13]

_____

[12] At one point in her deposition, Mrs. DiStiso appears to have stated that she advised Uccello of all three of these racial epithets the very first time she spoke with her, i.e., in a conversation outside the classroom during the first week of September 2002.

Q. So tell me what happened the first time. You pulled her outside [the classroom], and what did she say?

A. I told her the kids was calling him names.

Q. Which names did you tell her?

A. Same names: blacky, nigger, dirty hands.

Q. And what did she say to you?

A. She said she would talk to the kids in the class.

R. DiStiso Dep. Tr. at 137. This would be inconsistent with her earlier testimony indicating that Nicholas was first called "blacky" several months into the kindergarten year. Id. at 124. For purposes of this appeal, however, we assume that a jury would resolve any discrepancy favorably to plaintiff by assuming that she was identifying all the names she had reported to Mrs. Uccello in their "couple of" conversations. Id. at 136.

[13] The deposition transcript reports the following exchange:

Q. What did you tell him?

14

On or about May 7, 2003, toward the end of Nicholas's kindergarten year, Mrs. DiStiso filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), charging that Nicholas had been subjected to verbal harassment based on race from his kindergarten classmates, which had escalated to physical assaults. She stated that she complained to Uccello and Cook, who not only failed to take effective action to halt the misconduct, but also retaliated against Nicholas for Mrs. DiStiso's complaints by disciplining him, isolating him from other children, and recommending him for special education. The CHRO investigation found no reasonable cause to support Mrs. DiStiso's allegations of racial discrimination. See State of Connecticut, CHRO, Finding of No Reasonable Cause and Summary, No. 0330518, Aug. 9, 2005.

### (2)     First Grade

There is no evidence of Nicholas being subjected to racial name-calling during first grade. Record evidence indicates that the DiStisos frequently complained to either Couture

---

A.     I told him what happened in class and can he talk to the teacher and to see what's going on.

Q.     Specifically what did you tell him happened in the class?

A.     I don't know. The name calling and kicking. And it seemed like Mrs. Uccello is not doing the job, so maybe you can do something since he's a higher up, you know. He's a principal, so can he do something about the incident.

R. DiStiso Dep. Tr. at 159.

15

or Cook of physical encounters between Nicholas and his first-grade classmates, but in no communication did the DiStisos suggest that the encounters were racially motivated.

To illustrate, early in Nicholas's first-grade year, Mrs. DiStiso complained in writing to Couture simply that Nicholas had been coming home from school over "six to seven days" with juice stains on his clothing and complaining that classmates had thrown juice boxes at him at lunchtime. R. DiStiso Dep. Tr. at 113. On October 17, 2003, Cook responded, reporting that he had investigated the matter because Couture was not responsible for supervising Nicholas at lunch, and that the lunch aide on duty "said that she has seen Nicholas spill the juice he brings on a few occasions. Each time she has helped him clean it up with paper towels. She has not observed it on his jacket but has seen the juice on the table." Cook Letter, Oct. 17, 2003. While Mrs. DiStiso was dissatisfied with the response, she did not complain further, much less notify defendants that she thought the occurrences were racially motivated.

Nor did Mrs. DiStiso mention race in a February 3, 2004 note to Couture advising that Nicholas had complained of being kicked by "Jenny" at lunchtime when he tried "to ask her a question, and she got mad and said shut up." R. DiStiso Letter, Feb. 3, 2004. Responding in writing the next day, Cook reported that he had met with the children at the table and that Jenny said that Nicholas had falsely accused her of kicking him at lunch, prompting her to call the lunch aide to the table. Cook stated that he again spoke with the lunch aide, who said that because she had not seen the incident, she simply "ask[ed] all the students to be nice to one another." Cook Letter, Feb. 4, 2004. Cook advised that none of the other children at the

16

table could give him "any more information to clarify what happened." Id. Accordingly, Cook did not discipline any student, but did ask the lunch aide "to keep a sharp eye on the table during lunch and to report to me any problem." Id.

In a letter dated February 5, Couture advised the DiStisos of Nicholas's "inappropriate and disruptive" behavior that day. Couture Letter, Feb. 5, 2004.[14] In her February 9 response, Mrs. DiStiso accused Couture of falsely reporting misbehavior by Nicholas to satisfy Cook,[15]

---

[14] The note advised as follows:

> [Nicholas] was having difficulty sitting in his seat. I asked him to please sit correctly in his chair. He fell out again, then yelled at his chair, stop pushing me. He was writing and telling his pencil to stop it, as he moaned. He had to cut some cards for a math game, he was cutting without looking I warned him to pay attention. He continued to do this. I had to take the scissors away. During Art he was yelling at another student to stop calling him names. The teacher was standing right there, no name calling was happening. This type of behavior needs to stop. He is yelling out during class and it is difficult to teach in that environment. I would like to discuss this behavior with you. Please contact me as soon as possible.

Couture Letter, Feb. 5, 2004.

[15] Mrs. DiStiso's note stated as follows:

> This is about the fifth time I sent you a note about one of Nicholas classmates, hitting him or kicking him. After every note, you respond by sending a note claiming Nicholas is misbehaving. Its like clockwork. Instead of taking care of the problem that I complain about, you complain about Nicholas. When I sent the note in the other day, I bet my husband that you're reply would be that Nicholas did something wrong and I guess I was RIGHT. I know why you are doing this and you're time will come when you can testify as to why! I can't believe how you can pick on a little boy just to satisfy Mr. Cook. This is wrong and you would not want someone to do this to your child. You obviously don't think that Nicholas knows whats going on. Well think again, because he sees and hears everything and he knows how you mistreat him and

17

an apparent reference to Cook's efforts to place Nicholas in special education programs.[16]

Replying on February 24, Cook insisted that Mrs. DiStiso's recent letter was the only communication to complain of student physical contact with respect to Nicholas.[17] Cook denied any mistreatment of Nicholas by any Wakelee staff, and obliquely referenced the ongoing dispute over the child's special education needs.[18]

### 3. Mr. DiStiso's Recollections

#### a. Nicholas's Complaints

---

> that is why the other children in the class, mistreat him. This situation went
> to far.

R. DiStiso Letter, Feb. 9, 2004.

[16] Although Mrs. DiStiso did not specify in her February 9, 2004 note how Couture's report about Nicholas's misbehavior would "satisfy Mr. Cook," R. DiStiso Letter, Feb. 9, 2004, the record reveals that the DiStisos were then resisting Cook's efforts to place Nicholas in special education programs. In proceedings pending before the Connecticut Department of Education ("DOE"), the DiStisos complained that such placement was sought in retaliation for their complaints that the boy was the target of race discrimination. See State of Connecticut, DOE, Final Decision and Order, No. 03-404, Feb. 27, 2004. Apparently unpersuaded, on February 27, 2004, DOE authorized a neuropsychological assessment of Nicholas, as well as the development and implementation of a special education plan to be achieved while maintaining Nicholas in his regular first-grade classroom. See id. at 7–8.

At the time of Mrs. DiStiso's February 9, 2004 note to Couture, the DiStisos' CHRO complaint was also pending. See supra at 15-16.

[17] In the same letter, Cook responded similarly to a recent note from Mr. DiStiso, which is discussed in the next section. See infra at 21–22 n.19. We must, of course, assume that factual disputes as to the number of these communications would be resolved by the jury in favor of plaintiff.

[18] See Cook Letter, Feb. 24, 2004 ("Without more information on what [Nicholas's] needs are, and the proper support to attain them, he will not be successful in school. The Wakelee staff and Wolcott district is MORE than willing to take this responsibility.").

Mr. DiStiso, who was a Waterbury Police Officer during the time at issue, testified that at the end of Nicholas's first week of kindergarten, his son reported being kicked by a girl in his class while on the playground. The boy ascribed no racial motivation to the incident; rather, he explained that the girl was "just mean." P. DiStiso Dep. Tr. at 43. Thereafter, every "once in a while," Mr. DiStiso would notice black and blue marks on his son's body. Id. at 65. When asked how he got them, Nicholas stated that classmates were punching or kicking him.

Mr. DiStiso testified that sometime later in the school year, Nicholas told his father that classmates were saying that his hands were dirty even after the boy had washed them. He further reported "[s]everal times during the school year" that children had called him "blackie," including during a game of tag. Id. at 45–46. Finally, Nicholas reported classmates calling him "nigger" "[o]ver the course of the whole school year . . . probably maybe eight times." Id. at 62.[19]

### b. Mr. DiStiso's Complaints

#### (1) Kindergarten

Mr. DiStiso testified to no occasion when he himself reported any racial harassment of his son to Nicholas's kindergarten teacher, Uccello. Rather, he offered a hearsay statement that his wife wrote to and spoke with Uccello about these matters, relaying

---

[19] In response to a leading question as to whether it "could have been five, 15" times that Nicholas complained of racial name-calling, Mr. DiStiso replied, "Yes." P. DiStiso Dep. Tr. at 62.

"exactly what the kids were calling" Nicholas and requesting that the teacher "talk to the kids and tell them that's not something they should be doing, and to stop." Id. at 48.

Insofar as Mr. DiStiso himself spoke with Cook about his son, it was to complain that Cook was "watching my son a little too much," an apparent reference to the ongoing dispute about the child's need for special education. Id. at 69. Mr. DiStiso told Cook that he should "start watching the kids that are calling [Nicholas] names and picking on him and punching him and everything else instead of watching how [Nicholas] walks down the hallway or what he does in school all day." Id. Mr. DiStiso acknowledged that neither in this conversation nor in any other communication with Cook did Mr. DiStiso complain that the name-calling was racial or that any misconduct was racially motivated. Rather, Mr. DiStiso maintained that Cook "was aware" of this invidious motivation because "[w]e made several complaints about the exact names," an apparent hearsay reference to his understanding of his wife's communications. Id.

### (2) First Grade

Mr. DiStiso testified that while Nicholas was in first grade, he sent Couture and Cook various notes, many of which are part of the record. While the notes are blunt in their criticisms, none complained that Nicholas was experiencing racial harassment.[20]

_____

[20] In responding to Couture's report of Nicholas yelling in class and hiding, Mr. DiStiso stated as follows:

> Nicholas said that the reason he hid in the cubbey and closet is because you yelled at him in front of the class and he was embarrassed. Next time, try taking him aside and explaining the problem to him instead of yelling at a 6

20

Earlier in the school year, Mr. DiStiso had apparently also complained in person to Cook about an unidentified bearded man removing Nicholas from his first-grade classroom to question the child. Dissatisfied with Cook's response that the only person to have removed Nicholas from the classroom on the day in question was a female reading consultant, Mr. DiStiso referred the matter to the police who, after questioning Cook and Couture, did not pursue it further.

### (3)     Couture Pulling/Dragging Incident

Mr. DiStiso testified that on March 12, 2004, Nicholas's last day at Wakelee, his son

---

year old. Yelling isn't teaching and apparently you're not.

P. DiStiso Letter, Dec. 9, 2003. In another note from the same date acknowledging receipt of Nicholas's report card, Mr. DiStiso wrote, "Its amazing—all Nicholas's subjects are marked <u>E.D.</u>—<u>experiencing difficulty</u>. You're the teacher, what did you teach him? <u>Mrs. Couture</u>/Report Card <u>Teaching Skills</u>: Grade F." P. DiStiso Letter, Dec. 9, 2003 (emphases in original).

In an undated note to Cook that, from its content, appears to have been written in or around the second week of February 2004, Mr. DiStiso responded to a report of Nicholas's involvement in a playground fight as follows:

Nicholas has been complaining for the past month that other students have been punching and kicking him and he has had black and blue marks on his arms and legs. We have sent in several notes to Miss Couture. I <u>told</u> Nicholas to <u>defend</u> himself and if someone punches or kicks him to do the <u>same back</u> to them. Nicholas told us Tyler hit him first and he hit him back. I seriously doubt Nicholas is just running around the playground beating up kids for no reason. Probably someone did not see the first part of the fight, just the end. Nicholas is complaining of pain to his <u>left arm</u> and we may have to visit his doctor! Why is [student] James Kelly trying to break up a fight instead of a <u>TEACHER</u>?!!

P. DiStiso Letter, undated (emphases in original).

21

came home from school complaining that his arm, leg, and foot hurt because Couture had pulled and dragged him to Cook's office. Once again, Mr. DiStiso contacted the police, this time reporting a possible assault by the teacher. At his deposition, Mr. DiStiso testified that when a police officer interviewed Nicholas, the boy stated that his teacher thought he had been talking to another student without permission and told him to report to the principal's office. When the child refused, the teacher "grabbed him by the arm, pulled him out of the chair and dragged him partially across the classroom." Id. at 129.[21]

After interviewing Couture, who denied any physical contact with Nicholas, and various other persons at the school, the police decided not to file charges. At his deposition, Mr. DiStiso was critical of the police investigation, as well as the investigation subsequently conducted by the Connecticut Department of Children and Families, which found the DiStisos' assault complaint against Couture unsubstantiated.

Nicholas did not return to Wakelee. Instead, the following school year, his parents enrolled him in a private Catholic school.

B.     The District Court Decision

In rejecting defendants' qualified immunity defense on remand, the district court

---

[21] Couture's contemporaneous notes of the incident indicate that when Nicholas learned that he would be denied the class's Friday afternoon "treat" because of misbehavior earlier in the day, he threw a pencil. Couture Note, Mar. 12, 2004. When Couture told Nicholas that he was not the only student being denied a treat, Nicholas began to mimic Couture, resulting in him being put in a "time out." Id. Later, Nicholas started yelling out words as Couture wrote the homework assignment on the board and refused to stop, prompting the teacher to take the child to the principal's office. We do not attempt to resolve factual or evidentiary disputes pertaining to these events.

22

found that plaintiff had adduced "substantial evidence" of a "pervasive pattern of racial animus and physical abuse directed at Nicholas by other students during kindergarten." DiStiso *ex rel.* DiStiso v. Town of Wolcott, 750 F. Supp. 2d at 437. The district court ruled that, as to Uccello, there were "clearly questions of material fact regarding whether and at what point" the teacher "became aware of any racially motivated name-calling and physical abuse" against Nicholas. Id. at 436. With particular reference to physical misbehavior, the district court reasoned that "[w]hile it does not appear from the record that the DiStisos explicitly informed Uccello that they believed Nicholas was being physically abused because of his race, such an inference could be drawn by the jury based upon the fact that the physical abuse occurred contemporaneously with or after racially-derogatory name-calling of which the DiStisos claim they made Uccello aware." Id. Further, the district court concluded that depending on the resolution of those factual disputes, a jury could reasonably find that Uccello's failure to take any action in response to the abuse was clearly unreasonable. See id. The district court further determined that a jury could reasonably "consider the crayon-drawing incident as part of the deliberate indifference analysis." Id.

With regard to defendant Couture, the district court acknowledged that there was no record evidence that anyone ever complained to her that students were harassing Nicholas on account of his race. Nevertheless, "in light of the substantial evidence in the record regarding the pervasive pattern of racial animus and physical abuse directed at Nicholas by other students during kindergarten," the district court concluded that "it would be reasonable for a jury to conclude that Couture was aware of the prior racial discrimination against

23

Nicholas," id. at 437, and "that the instances of physical abuse that occurred during first grade were racially motivated as well," id. at 439. Thus, there were "genuine issue[s] of material fact for trial as to whether [Couture] was deliberately indifferent to known [racial] harassment" by Nicholas's peers, id. at 442; and whether her "responses to the instances of physical abuse . . . were 'clearly unreasonable' under the circumstances," id. The district court ruled that a jury could, in answering these questions, consider the pulling/dragging incident attributed to Couture.

Finally, with respect to Cook, the district court observed that although it was not clear "when exactly" Cook learned of the name-calling in kindergarten, id. at 443, the record could support the conclusion that Cook did have such knowledge and did nothing in response beyond interviewing Uccello, which could be found unreasonable. Further, the district court reasoned that in light of Cook's knowledge of the racially derogatory name-calling in kindergarten, as well as the filing of the CHRO complaint, "a reasonable jury could infer that the acts of physical abuse that occurred during first grade were also racially motivated." Id. at 445. Moreover, based on Cook's failure to take "any specific actions" in response to the kindergarten harassment, id. at 444, the district court concluded that a reasonable jury could find that Cook's responses to physical misbehavior in the first grade—"investigating each incident, speaking with the parties involved, and reporting his findings to the DiStisos"—were also clearly unreasonable under the circumstances, id. at 445. The district court concluded that a jury could consider evidence of Cook's alleged inadequate response to a racial graffiti incident at another school where he had previously served as principal as

24

"further evidence of Cook's discriminatory intent" when responding to the claimed student harassment against Nicholas.  Id. at 446.

## II.    Discussion

### A.    Jurisdiction and Standard of Review

Although the denial of a motion for summary judgment is generally not appealable, an exception applies where, as here, the challenged denial is based on the rejection of qualified immunity.  See Doninger v. Niehoff, 642 F.3d 334, 352 (2d Cir.), cert. denied, 132 S. Ct. 499 (2011); Walczyk v. Rio, 496 F.3d 139, 153 (2d Cir. 2007).  Such a denial is appealable only to the extent that resolution of the qualified immunity defense turns on issues of law.  See Doninger v. Niehoff, 642 F.3d at 352.  Thus, on such an appeal, we generally may not review a district court's determination that record evidence gives rise to genuine factual disputes.  See Johnson v. Jones, 515 U.S. at 313; accord Behrens v. Pelletier, 516 U.S. at 313; Salim v. Proulx, 93 F.3d at 89.[22]

This does not mean that a district court can fully insulate a qualified immunity denial from appellate review "[s]imply [by] declaring that genuine issues of fact exist." Martinez v. City of Schenectady, 115 F.3d 111, 114 (2d Cir. 1997).  Rather, we may exercise interlocutory jurisdiction over a qualified immunity denial in such circumstances "if the

_____

[22] Although there may be rare circumstances in which it may "be appropriate to exercise 'pendent appellate jurisdiction' over" even factual disputes, Johnson v. Jones, 515 U.S. at 318; see also Toussie v. Powell, 323 F.3d 178, 184 (2d Cir. 2003) (discussing court's standard permitting appellate review of "pendant issues" that are "inextricably intertwined with" legal question of qualified immunity (internal quotation marks omitted)), defendants do not suggest that this is such a case.

25

defendant contests the existence of a dispute or the materiality thereof" as a matter of law, or "contends that he is entitled to qualified immunity even under plaintiff's version of the facts." Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir. 1998); see Johnson v. Jones, 515 U.S. at 313; accord Behrens v. Pelletier, 516 U.S. at 313; Salim v. Proulx, 93 F.3d at 89. In addressing any such legal challenges here, our standard of review is de novo. See Faghri v. Univ. of Conn., 621 F.3d 92, 96 (2d Cir. 2010).

B.      The Qualified Immunity Defense

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted). Qualified immunity thus affords government officials "breathing room" to make reasonable—even if sometimes mistaken—decisions, id. at 1249 (internal quotation marks omitted), and "protects all but the plainly incompetent or those who knowingly violate the law" from liability for damages, id. at 1244 (internal quotation marks omitted). Whether qualified immunity applies in a particular case "generally turns on the objective legal reasonableness" of the challenged action, "assessed in light of the legal rules that were clearly established at the time it was taken." Id. at 1245 (internal quotation marks omitted).

In Saucier v. Katz, the Supreme Court instructed courts to conduct a qualified immunity inquiry sequentially, first deciding whether the plaintiff has complained of the violation of a right guaranteed by the Constitution or federal law, and only then assessing

26

whether the right was sufficiently clearly established at the time of the official's actions that it would have been "clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." 533 U.S. at 202. More recently, the Court has afforded flexibility in this area. See Pearson v. Callahan, 555 U.S. at 234. While sequential analysis "promotes the development of constitutional precedent," id. at 236, where qualified immunity is clearly warranted at the second step of analysis, courts may simply rule on that basis without employing "scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case," Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (internal quotation marks omitted).

C.     Deliberate Indifference as a Basis for Claiming Denial of Equal Protection

The constitutional right here at issue is afforded by the Equal Protection Clause, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The "central purpose" of the Equal Protection Clause is "the prevention of official conduct discriminating on the basis of race," the very misconduct alleged in this case. Washington v. Davis, 426 U.S. 229, 239 (1976). To prevail on a § 1983 claim of race discrimination in violation of equal protection, the law requires a plaintiff to prove the defendant's underlying "racially discriminatory intent or purpose." Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 2665 (1977); accord Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d at 139–40 (collecting cases).

Since Gant, it has been clearly established law in this circuit that claims of intentional race discrimination can be based on the "deliberate indifference" of school boards,

27

administrators, and teachers to invidious "harassment, in the school environment, of a student by other children or parents." Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 140 (holding that "only deliberate indifference to such [racial] harassment can be viewed as [intentional] discrimination by school officials themselves"). Thus, to succeed on a § 1983 equal protection claim of deliberate indifference to student-on-student racial harassment, well established law requires a plaintiff to prove (1) that the child in question was in fact harassed by other students based on his race, see id. at 140; (2) that such race-based harassment was "actually known" to the defendant school official, id. at 141 n.6; and (3) that the defendant's response to such harassment was so "clearly unreasonable in light of the known circumstances" as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur, id. at 141 (internal quotation mark omitted). In identifying these elements, Gant emphasized that deliberate indifference "is 'not a mere "reasonableness" standard' that transforms every school disciplinary decision into a jury question." Id. (quoting Davis el rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 649 (1999)). Rather, consistent with the well established requirement that an equal protection violation be intentional or purposive, see Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 265, the Gant elements work together to ensure that "[t]he ultimate inquiry" in a deliberate indifference case "is one of [racially] discriminatory purpose on the part of the defendant himself," Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 141.

28

D.   Defendants' Qualified Immunity Defense to Plaintiff's Claim of Deliberate Indifference to Student Racial Harassment

Consistent with our obligation to consider a qualified immunity defense "in light of the specific context of the case, not as a broad general proposition," Saucier v. Katz, 533 U.S. at 201, we separately consider the claims that defendants Uccello and Cook were indifferent to racial name-calling directed at Nicholas in kindergarten and the claims that all defendants were indifferent to racially motivated physical misbehavior directed at Nicholas in both kindergarten and first grade. We conclude that qualified immunity is not available to defendants Uccello and Cook in the first context on the evidentiary record set forth by the district court. We conclude, however, that qualified immunity is available as a matter of law in the second context.

1.   Uccello and Cook: Racial Name-Calling in Kindergarten

a.   Record Evidence of Racial Name-Calling in Kindergarten Satisfies Even the *Davis* Standard of Harassment

At the outset, we note that defendants generally maintain that the first element of a deliberate indifference claim required plaintiff to adduce evidence that Nicholas not only experienced student-on-student harassment based on race, but that this racial harassment was "so severe, pervasive, and objectively offensive" as to have deprived the child "of access to the educational opportunities or benefits provided by the school." Gant *ex rel.* Gant v. Wallingford Bd. of Educ., 195 F.3d at 140 n.5 (quoting Davis *ex rel.* LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. at 650) (internal quotation mark omitted). Defendants assert that in the absence of such evidence, they were under no constitutional obligation to take any

29

action in response to any complaints of student racial harassment of Nicholas. It is useful to clarify at the outset that this argument misconstrues our decision in Gant.

In Gant, we observed that in Davis *ex rel*. LaShonda D. v. Monroe County Board of Education, the Supreme Court had located a particular severity requirement in the language of Title IX for claims brought under that statute for school districts' deliberate indifference to student-on-student sexual harassment. See Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 140 n.5 (citing Davis, 526 U.S. at 648–52). Thus, school officials could not be liable under Title IX for failure to respond to harassment consisting of nothing more than "simple acts of teasing and name-calling among school children, . . . even where these comments target differences in gender." Davis *ex rel*. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. at 652. But in Gant, we specifically declined to decide whether the severity requirement that Davis derived from Title IX's statutory text also applied to deliberate indifference claims under the Constitution's Equal Protection Clause. See Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 140 n.5 ("We need not—and do not—decide whether mere name-calling is insufficient in the equal protection setting as well . . . ."). Indeed, the Supreme Court has signaled caution in drawing any such conclusion. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009) (observing that "standards for establishing" Title IX liability and equal protection liability based on discriminatory harassment in the public school context "may not be wholly congruent").

Defendants submit that if we were now to hold that the degree of racial harassment necessary to support a deliberate indifference claim under the Equal Protection Clause is less

30

than that required to support such a claim under Title IX, they would be entitled to qualified immunity because no such rule of law was clearly established at times relevant to plaintiff's claim. We need not here conclusively decide whether the <u>Davis</u> standard applies to equal protection claims because the record, as viewed by the district court, is sufficient to permit a jury to find that standard of severity satisfied in any event with regard to the racial name-calling allegedly experienced by Nicholas during kindergarten and to which defendants Uccello and Cook were purportedly indifferent.[23]

In reaching this conclusion, we recognize that much of the evidence pertaining to racial harassment of Nicholas is a product of limited memory—indeed, very limited memory in the case of Nicholas himself, the only witness with direct knowledge of any of the alleged racial incidents occurring at school. <u>See</u> <u>supra</u> Part I.A.1.[24] Nevertheless, if the jury were to credit Nicholas, as we must assume it would, it could find that kindergarten classmates called the child racial epithets or disparaged his race in no fewer than three ways: (1) by calling him "nigger," (2) by calling him "blackie," and (3) by suggesting that the boy's skin remained dirty even after washing. Defendants do not—and cannot—dispute that such conduct, particularly use of the reviled epithet "nigger," raises a question of severe

_____

[23] At any trial on remand, defendants may request jury interrogatories as to the severity of the harassment found in order to preserve their qualified immunity claim if a jury were to find for plaintiff on any lesser standard of severity than the one articulated in <u>Davis</u>, and if this court were later to approve such a standard.

[24] Mrs. DiStiso was only a direct witness to a kindergarten classmate calling her son "nigger" at a birthday party held outside of school.

31

harassment going beyond simple teasing and name-calling. See Davis *ex rel*. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. at 652. In the work context, we have observed that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 439 (2d Cir. 1999) (internal quotation marks omitted), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Similarly, in the school context, a teacher's indifference to children's use of this particular epithet to belittle a child may well be found to have caused the sort of educational deprivation referenced in Davis, particularly if its use was "sufficiently continuous and concerted . . . to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation mark omitted) (stating with respect to Title VII claims of sex discrimination that isolated acts, unless very serious, generally do not meet threshold of severity or pervasiveness).

Although Nicholas himself had no present recollection of the frequency of these racially derogatory remarks or even of who said them, when they were said, or the circumstances in which they were said, see supra Part I.A.1.a, his parents testified that their son complained of racial name-calling, specifically, use of the word "nigger," approximately eight, and possibly as many as 15, times over the course of his kindergarten year. See supra Part I.A.3.a. Mr. and Mrs. DiStiso may not be competent witnesses to the underlying truth of their child's complaints, i.e., to the fact that other children called Nicholas racial epithets.

32

*See supra* Part I.A. But if a jury were to credit Nicholas's testimony that he experienced such name-calling and reported it to his parents, his parents' testimony as to the number of times their son made such reports, which we must assume would also be credited, might constitute circumstantial evidence as to the frequency of the harassment. This is enough to raise triable issues of fact as to (1) whether Nicholas experienced racial name-calling during his kindergarten year at Wakelee and, if so, (2) whether that name-calling was sufficiently severe or pervasive as to have effectively deprived the child of educational opportunities provided by the school.

Thus, neither Uccello nor Cook, whom plaintiff sues for deliberate indifference to racial harassment of Nicholas in kindergarten, is entitled to qualified immunity on the ground that the harassment demonstrated was insufficiently severe or pervasive to fall within a clearly established right of equal protection.

### b. The Actual Knowledge Element

Defendants Uccello and Cook next contend that they are entitled to qualified immunity because the record does not demonstrate their actual knowledge of racially motivated student harassment. See Gant *ex rel.* Gant v. Wallingford Bd. of Educ., 195 F.3d at 141 & n.6. No evidence was adduced that either Uccello or Cook ever witnessed any Wakelee student use racial epithets toward Nicholas. Nor did Nicholas testify that he ever reported the use of such epithets to any person at Wakelee. Thus, the relevant evidence of notice is provided only by his parents.

As to Uccello, Mrs. DiStiso testified that, in the first week of September, on the day after Nicholas told her that a classmate had slapped him and called him "nigger," she met in person with Uccello to complain about the incident. See supra Part I.A.2.b.(1). Further, assuming that any inconsistencies in Mrs. DiStiso's testimony would be resolved in her favor, a reasonable jury could find that Mrs. DiStiso complained about students' use of racial epithets to Uccello at least one more time in person, see R. DiStiso Dep. Tr. at 137–38, 145, and about the dirty-hand comment on one occasion in writing, id. at 131.[25] This is sufficient to raise a triable question of fact as to Uccello's actual knowledge of the alleged student racial harassment.

The record is less clear as to whether Cook was specifically alerted to racial name-calling in kindergarten.[26] The district court, however, construed the evidence to "indicate[]"

_____

[25] Insofar as Mr. DiStiso testified that his wife spoke with Uccello and told the teacher "exactly what the kids were calling" Nicholas, P. DiStiso Dep. Tr. at 48, we note that he is likely not a competent witness to testify as to what Uccello knew since he did not witness this conversation, though we may not ourselves decide such an evidentiary matter on this interlocutory appeal. See Johnson v. Jones, 515 U.S. at 313; accord Behrens v. Pelletier, 516 U.S. at 313; Salim v. Proulx, 93 F.3d at 89.

[26] As discussed supra Part I.A.2.b.(1), when Mrs. DiStiso was asked to detail what she told Cook in her telephone complaints to the principal, she replied, "I don't know. The name calling and kicking. And it seemed like Mrs. Uccello is not doing the job, so maybe you [i.e., Cook] can do something since he's a higher-up, you know." R. DiStiso Dep. Tr. at 159. Mrs. DiStiso never mentioned racial epithets or racial motivation in her written communications to Cook or to any other school official: in "all of my letters I didn't put niggers, black, I didn't put no racials in there. I just put down he was teased because I feel that I didn't have to—I didn't want to put that in there." Id. at 242. Insofar as Mr. DiStiso testified that "[w]e made several complaints about the exact names," he appears to be referencing his wife's communications with Cook, not his own. P. DiStiso Dep. Tr. at 69.

34

that the DiStisos complained to Cook early in the kindergarten school year that other students were calling Nicholas <u>racially</u> derogatory names." <u>DiStiso</u> *ex rel.* <u>DiStiso v. Town of Wolcott</u>, 750 F. Supp. 2d at 445 (emphasis added). Accepting that characterization on this appeal, <u>see</u> <u>Doninger v. Niehoff</u>, 642 F.3d at 352, there is a triable issue of fact on the actual knowledge element of a deliberate indifference claim as clearly established in <u>Gant</u>.

Thus, neither Uccello nor Cook is entitled to qualified immunity on the actual knowledge prong of plaintiff's claim that they were deliberately indifferent to racial name-calling in kindergarten.

c. The Reasonable Response Element

Finally, defendants Uccello and Cook argue that they are entitled to qualified immunity because their responses to complaints of kindergarten name-calling were, as a matter of law, not unreasonable, or alternatively, that they were not so clearly unreasonable as to have violated established equal protection law. <u>See</u> <u>Gant el rel. Gant v. Wallingford Bd. of Educ.</u>, 195 F.3d at 141. We are not persuaded.

As to Uccello, Mrs. DiStiso testified that, in response to complaints of racial name-calling by kindergartners, the teacher stated that she would talk to the children involved. Uccello maintains that talking to the children was not a clearly unreasonable response to the conduct at issue. The problem with this argument is that the district court found the record evidence sufficient to permit a reasonable jury to conclude that Uccello did <u>nothing</u> in response to several of Mrs. DiStiso's complaints of racial name-calling. To be sure, Uccello offered no evidence that she ever spoke to a kindergarten student about <u>racial</u> name-calling.

35

This is hardly surprising given the teacher's insistence that no one ever reported racial name-calling to her.[27]  But assuming, as we must on this appeal, that a jury would credit Mrs. DiStiso's testimony that she specifically alerted Uccello to racial name-calling at least twice orally and once in writing, and that the jury would further find that Uccello did nothing to stop or deter such race-based mistreatment of Nicholas, that would be sufficient to raise a material factual question as to the reasonable response element of the deliberate indifference claim.  Indeed, defendants do not even argue that a teacher could think that a reasonable response to <u>repeated</u> complaints of <u>repeated</u> student racial name-calling was to do nothing.

The district court also concluded that record evidence would permit a reasonable jury to find that Cook did nothing in response to kindergarten complaints of racial name-calling except speak to Uccello; he did not conduct "a 'full' investigation" of the incidents.  <u>DiStiso ex rel</u>. <u>DiStiso v. Town of Wolcott</u>, 750 F. Supp. 2d at 435.  Because such a response to purported actual knowledge that children were repeatedly calling a student racial epithets, including a reviled racial epithet, could be found unreasonable, Cook too is not entitled to qualified immunity as a matter of law on this part of plaintiff's claim.

---

[27] Mrs. DiStiso acknowledged that on one occasion when she sent Uccello a letter asking her to speak to a child "about calling Nicholas names," she did not advise the teacher that the names used were racial epithets. R. DiStiso Dep. Tr. at 126; <u>see</u> <u>id.</u> ("I didn't wrote no names, I didn't put blacky there, I didn't put nigger there.").  Mrs. DiStiso testified that Uccello reported speaking to the child, who denied calling Nicholas names.  Mrs. DiStiso considered this response unsatisfactory because "it seemed" that Uccello was taking "the other kid's word over my son's."  <u>Id.</u> at 128.  She thought the teacher should have spoken to both children and told them "that's not a nice word, you shouldn't call, you know."  <u>Id.</u> at 129.

In sum, there are disputed issues of fact as to each element of plaintiff's claims that Uccello and Cook were deliberately indifferent to kindergarten students' repeated use of racial epithets to belittle Nicholas. Because the district court found the record evidence sufficient to allow each of those elements to be decided in favor of plaintiff, and because we must accept that sufficiency determination on this appeal, Uccello and Cook are not entitled to judgment on the ground of qualified immunity.

### 2. All Defendants: Racially Motivated Physical Misbehavior

#### a. The Actual Knowledge Element

We reach a different conclusion with respect to plaintiff's claims that defendants were each deliberately indifferent to students' racially motivated physical misbehavior toward Nicholas. In so doing, we identify legal error in the district court's analysis, which appears not to have meaningfully distinguished the second element of a deliberate indifference claim as established by Gant, i.e., a defendant's actual knowledge of student-on-student racial harassment, see Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 141 & n.6, from the first element, i.e., students' racial harassment of a peer, see id. at 141. Rather, the district court largely elided consideration of the actual knowledge element by relying on an assumption as to the racial harassment element that is not clearly established in law: that evidence of student-on-student racial harassment in any respect can, without more, support an inference that any further student misbehavior directed to the same peer is also racially motivated. That assumption gave rise to another, also not clearly established in law: that evidence of a school official's knowledge of the initial racial harassment is enough, by itself,

37

to permit a finding of his actual knowledge that any further misbehavior was also racially motivated. As we will explain herein, this mistakenly transformed the actual knowledge requirement established by Gant into an imputed knowledge requirement, and imputed knowledge is insufficient as a matter of law to support a claim for deliberate indifference. Where, as in this case, the subsequent misbehavior is of a type routinely engaged in by school children of the age at issue without regard to motivation, there must be some objective evidence linking initial racially hostile acts to such subsequent misbehavior to support a finding that a school official has actual knowledge that the latter behavior, like the former, is racially motivated.

Here, the only record account of physical misbehavior that is objectively linked to racial harassment is Mrs. DiStiso's hearsay testimony that a kindergarten student slapped Nicholas when the student called Nicholas "nigger." Assuming that admissible evidence of this occurrence could be adduced, defendants Uccello and Cook are not entitled to qualified immunity for the reasons discussed in the preceding section of this opinion. But as to all other complaints of physical misbehavior, there is no objective evidence linking the physical conduct to the alleged racial name-calling. Nor is there evidence that the misbehavior went beyond the commonplace for children of Nicholas's age. In these circumstances, no clearly established law would have alerted defendants that they could be deemed to have actually known that the physical misbehavior was racially motivated so as to expose their responses to the physical misbehavior to possible constitutional scrutiny.

We discuss this conclusion further as it pertains to each individual defendant.

38

### (1) Uccello

In contrast to record evidence that Mrs. DiStiso personally advised defendant Uccello of kindergarten racial name-calling, no evidence indicates that any of the DiStisos advised Uccello that they thought students' physical misbehavior (with the exception of the aforementioned slap) was racially motivated. Nevertheless, the district court relied on an unpublished decision from a neighboring district, Patenaude v. Salmon River Central School District, No. 03-CV-1016 (TJM), 2005 WL 6152380 (N.D.N.Y. Feb. 16, 2005), to support its conclusion that a jury could infer Uccello's actual knowledge of a racial motive for any physical misbehavior directed at Nicholas in kindergarten simply from her awareness of the racial name-calling. This was error.

Patenaude involved numerous incidents of verbal and physical abuse, some quite egregious, by high school students. The district court stated that even though school authorities were not made known of all the misconduct, "a fair-minded trier of fact could reasonably conclude that, once the school district was aware of potential racial discrimination, all the other incidents to which Plaintiff was subjected (e.g., physical assaults, non-race-based name-calling, the doctored picture, etc.) were in furtherance of the race-based harassment." Id. at *8. Citing this language, the district court in this case concluded that a reasonable jury could find that all physical misbehavior directed at Nicholas by his classmates was racially motivated based on "the fact that the physical abuse occurred . . . after racially-derogatory name-calling." DiStiso ex rel. DiStiso v. Town of Wolcott, 750 F.

39

Supp. 2d at 436. Further, because "the DiStisos claim they made Uccello aware" of the racial name-calling, that was sufficient to raise "clear[] questions of material fact" regarding Uccello's actual knowledge of the kindergartners' racial motivation for all physical misbehavior. Id. In short, because a jury could infer that "physical abuse occurr[ing] . . . after racially derogatory name-calling" was racially motivated (the first element of a deliberate indifference claim), that was a sufficient basis for finding that a teacher who was aware of the name-calling had actual knowledge that any subsequent physical misbehavior was also racially motivated (the second element). Id.

The reasoning is legally flawed in several respects. First, to the extent its legal foundation is Patenaude, an unpublished 2005 district court decision cannot define the scope of clearly established deliberate indifference law in this circuit in 2002 through 2004, the years at issue in this case. "We look to Supreme Court and Second Circuit precedent at the time of the alleged violation to determine whether [challenged] conduct violated a clearly established right." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 434 (2d Cir. 2009). Second, insofar as Patenaude itself relied on two decisions of this court, Feingold v. New York, 366 F.3d 138 (2d Cir. 2004), and Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir. 2000), these employment cases hold only that evidence of a defendant's hostility toward a plaintiff based on multiple protected characteristics, such as race, sex, and religion, may in some circumstances be considered together in assessing a discrimination claim. See Feingold v. New York, 366 F.3d at 151–52; Cruz v. Coach Stores, Inc., 202 F.3d at 572. Neither case discusses when evidence of a single invidious motive for certain

40

conduct (here, racial name-calling) supports an inference of invidious motivation for other conduct (here, routine physical misbehavior by five- and six-year-olds). Much less do these cases clearly establish that a teacher's actual knowledge of children's racial motivations for the latter conduct can be inferred simply from her awareness of the earlier invidious conduct. Third, the relevancy of employment discrimination decisions such as Feingold and Cruz is limited by the Supreme Court's observation in Davis that "schools are unlike the adult workplace." Davis *ex rel*. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. at 651. "[C]hildren may regularly interact in a manner that would be unacceptable among adults," id., making assumptions about the motivations underlying children's actions particularly difficult. Recognition of this reality reinforces the need for more than speculation to prove a teacher's actual knowledge that commonplace schoolyard misbehavior by very young children is invidiously motivated.

To date, no Supreme Court or Second Circuit law clearly establishes that evidence of prior racial name-calling by unidentified kindergarten or first-grade students suffices to demonstrate that any subsequent physical misbehavior directed at the same classmate is also racially motived. Indeed, we conclude that something more is necessary to support an inference that a teacher or school official actually knew such subsequent misconduct was racially motivated. Notably, in Patenaude, the record revealed that the same identified students were engaged in both the conduct whose invidious purpose was evident and the conduct whose purpose was ambiguous. See Patenaude v. Salmon River Cent. Sch. Dist., 2005 WL 6152380, at *1–4. The common perpetrators provided an objective connection

41

linking the latter conduct to the former, so as to permit a reasonable inference that the actions shared the same invidious motive. In such circumstances, a jury might well find that if a teacher actually knows that particular students have harassed a classmate for invidious reasons on several occasions, the teacher actually knows that the same prohibited motive animates the same students' further misbehavior toward the same classmate.

By contrast, in this case, there is no record evidence as to the identity of any child who engaged in the alleged racial name-calling. Nor is there any evidence that any perpetrators of the alleged physical misbehavior (again, with the exception of the slapping incident) (1) were involved in the earlier racial name-calling, (2) witnessed the earlier racial name-calling, or (3) even knew about the earlier racial name-calling. Absent some such evidence to connect the racial name-calling to the later commonplace physical misbehavior, there is no basis in established law for inferring that a teacher who receives complaints as to the racial motivation for former conduct has actual knowledge that the latter conduct is similarly motivated. While Gant recognizes that evidence showing that the defendant "should have known" that conduct was invidious "can, in some circumstances, create an inference . . . that the defendant did know," Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 141 n.6 (emphasis in original), even "should have known" here requires some objective connecting evidence between the racial name-calling and the subsequent routine physical misbehavior. To hold otherwise, as our dissenting colleague urges, would effectively transform Gant's actual knowledge requirement into an imputed knowledge standard. This we decline to do lest deliberate indifference liability reach beyond those school officials who can be said to

42

have violated the Equal Protection Clause by themselves intending race discrimination to continue. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 264–65; accord Gant *ex rel.* Gant v. Wallingford Bd. of Educ., 195 F.3d at 139–40.

In sum, because the record evidence is insufficient, as a matter of law, to support a finding that Uccello actually knew that her kindergarten students' routine physical misbehavior toward Nicholas was racially motivated, Uccello is entitled to an award of summary judgment based on qualified immunity for this part of plaintiff's deliberate indifference claim.

### (2)     Couture

The same conclusion applies with even more force to Couture. No evidence was adduced of any racial name-calling in first grade. Nor did the DiStisos ever complain to Couture that physical misbehavior in first grade was racially motivated. Further, because there was only a partial overlap between the students in Nicholas's kindergarten and first-grade classes, and because the perpetrators of the racial name-calling in kindergarten have never been identified by name, one could only speculate as to whether any name-caller was in both classes, or even whether any first-grader involved in physical misbehavior had witnessed or knew of the name-calling. Moreover, all or most of the alleged first-grade incidents occurred on the playground or in the lunchroom, where Couture was not present and had no supervisory responsibility.

While the district court acknowledged the lack of record evidence that Couture ever received any complaints about racially motivated harassment during first grade or that she

43

knew about racial harassment in kindergarten, it nevertheless concluded that a jury could "presume that Couture familiarized herself with the histories of her incoming students in order to develop her teaching plan." DiStiso *ex rel*. DiStiso v. Town of Wolcott, 750 F. Supp. 2d at 437. And assuming Couture had undertaken such review, the district court reasoned, she would have discovered the DiStisos' kindergarten allegations of racially motivated harassment. See id. at 438.

We identify legal error in such reliance on presumptions and speculation to support an inference not only that Couture had actual knowledge of complaints of past racial harassment, but also that she therefore had actual knowledge that the commonplace physical misbehavior of her first-grade students was racially motivated. Although Gant acknowledges that "a showing that the defendant 'should have known' can, in some circumstances, create an inference . . . that the defendant did know," Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 141 n.6 (emphasis in original), the circumstances presented here do not, as a matter of law, permit such an inference. This is so because the inference deemed permissible by the district court, i.e., that Couture knew of the DiStisos' complaints in kindergarten, specifically, the complaints of racial name-calling, is derived not from "circumstances that were . . . actually known to" Couture, id., but rather from an assumption unsupported by established law, i.e., that Couture should have taken steps to learn more about the circumstances of the past school year. There is no meaningful difference between stating that a jury can reasonably presume that particular affirmative steps were taken by a defendant and holding that such a defendant has a legal duty to take such affirmative steps. In fact, neither

44

Gant nor any other decision by the Supreme Court or this court establishes a teacher's duty affirmatively to investigate student files for possible prior complaints of racial harassment at the risk of being charged with deliberate indifference. Nor is there any basis for speculating that Couture took such steps here. There is no record evidence as to the practices routinely followed by this teacher or her peers in this respect, nor is there any evidence of school policies on the subject.

In any event, for the reasons fully discussed supra Part II.D.2.a.(1), even if Couture had undertaken such an investigation and learned of the racial name-calling in kindergarten, such knowledge would not by itself demonstrate her actual knowledge that any physical misbehavior directed at Nicholas in first grade was racially motivated. Because the physical misbehavior at issue was not out of the ordinary for first-graders, some objective evidence was necessary to link the misconduct to the racial name-calling to support an inference that Couture had actual knowledge that the physical misbehavior was racial harassment. No such evidence having been adduced, Couture is entitled to summary judgment on the ground of qualified immunity.

(3)    Cook

For the same reasons already discussed with respect to Uccello and Couture, see supra Part II.D.2.a.(1), no clearly established law permits an inference that Cook had actual knowledge that the complained-of physical misbehavior toward Nicholas in kindergarten or first grade was racially motivated in the absence of some objective evidence connecting the latter misbehavior to the earlier racial name-calling. The DiStisos' CHRO complaint

45

provided Cook with notice only of the parents' subjective belief that physical misbehavior toward Nicholas which the parents did not witness was race-based. There is no basis in clearly established law to alert a school official that the communication of such subjective belief can by itself provide the requisite actual knowledge that children's subsequent commonplace misbehavior is racially motivated. Rather, we conclude that here, some evidence of an objective link between the alleged racial name-calling in kindergarten and the ensuing physical misbehavior is required to permit an inference of a defendant's actual knowledge of racial motivation. See id. No such evidence having been adduced, Cook too is shielded by qualified immunity from plaintiff's claim that he was deliberately indifferent to racially motivated physical misbehavior by Nicholas's kindergarten and first-grade classmates.

b.      The Reasonable Response Element

Because plaintiff's claims of deliberate indifference to physical misbehavior fail at the actual knowledge step of Gant analysis, we need not consider defendants' arguments for qualified immunity based on the final, reasonable response, element of a deliberate indifference claim. See Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 141. Any such inquiry would of course require us to assume that plaintiff could prove both that the physical misbehavior was racially motivated and that defendants had actual knowledge of that fact. Nevertheless, because we identify legal error in the district court's analysis of the third element of a deliberate indifference claim as it pertains to Couture, we correct that error here.

46

As the district court acknowledged, Couture "reported each [alleged] incident [of physical misbehavior] to Cook" after she learned of it so that Cook could conduct an investigation. DiStiso *ex rel*. DiStiso v. Town of Wolcott, 750 F. Supp. 2d at 442. Nevertheless, the district court concluded that Couture's failure to take "personal action" to stop the physical misbehavior raised a question of fact as to the reasonableness of her response. Id. Gant instructs to the contrary.

In Gant, we held that deliberate indifference claims against a school principal failed as a matter of law because the principal, who "was not responsible for disciplining the offender," reasonably declined to take further actions in response to alleged racial name-calling after a teacher held a class meeting to discuss the misconduct. Gant *ex rel*. Gant v. Wallingford Bd. of Educ., 195 F.3d at 145. Here, although Couture was Nicholas's classroom teacher, the DiStisos' complaints of student physical misbehavior during first grade pertained to matters that Couture did not witness, and that occurred largely, if not exclusively, in school areas that Couture did not supervise. Under such circumstances, a teacher who promptly transmits parental complaints up the chain of authority to her principal cannot be found to have responded in a way that was so "clearly unreasonable" under established law as to deny qualified immunity. Id. at 141. Certainly, plaintiffs adduced no evidence that Couture knew or had reason to believe that Cook would not investigate the transmitted complaints so as to warrant any different conclusion. Thus, this further compels judgment in favor of Couture on the ground of qualified immunity.

47

## III.    Conclusion

To summarize, we conclude as follows:

1. With respect to plaintiff's claims of deliberate indifference by defendants Uccello and Cook to kindergarten students' allegedly using racial epithets to disparage a classmate, these two defendants are not entitled to qualified immunity because there are disputed questions of fact for which the district court identified sufficient record evidence to support a verdict in favor of plaintiff.

2. With respect to plaintiff's claims of deliberate indifference by all defendants to allegedly racially motivated physical misbehavior by kindergarten and first-grade students toward a classmate (with the exception of the slapping incident), defendants are entitled to qualified immunity because no clearly established law permits a finding that these defendants had actual knowledge that commonplace physical misbehavior by children of this age was racially motivated in the absence of some objective evidence connecting the physical misbehavior to the earlier racial name-calling. Couture is further entitled to qualified immunity on this claim because her transmittal of parental complaints of physical misbehavior to Cook for investigation cannot be deemed "clearly unreasonable" as a matter of law.

Accordingly, the district court's order denying summary judgment is AFFIRMED IN PART as it pertains to plaintiff's claims of deliberate indifference by Uccello and Cook to racial name-calling, and REVERSED IN PART as it pertains to plaintiff's claims of deliberate indifference by Uccello, Couture, and Cook to physical misbehavior (with the exception of

48

the slapping incident). The case is REMANDED for further proceedings consistent with this opinion including the entry of judgment in favor of defendants on the claims of deliberate indifference to physical misbehavior.

POOLER, *Circuit Judge*, concurring in part and dissenting in part.

I respectfully dissent from the majority's conclusion that the kindergarten teacher in this case is entitled to qualified immunity from suit for her alleged deliberate indifference to all but a single incident of physical harassment that one of her students allegedly suffered while he was in her class.

Nicholas DiStiso, a kindergarten student who was the only black child in his class, came home from school one day and told his mother that a girl had slapped him and called him a "nigger."[1]  His mother was infuriated and reported the incident to her son's teacher, Jacquelyn Uccello.  The abuse, however, was unrelenting.  Over the course of the school year, Nicholas told his father on as many as fifteen occasions that children at school had called him a "nigger."  The boy's mother complained several times to her son's teacher that his classmates were calling him "the 'N' word, dirty hands, [and] blacky."

In addition to informing the teacher that Nicholas was being called vulgar racial slurs by children at school, his mother reported repeated incidents in which her son was physically abused by his classmates.  Specifically, the boy's mother reported to the teacher that Nicholas had been pinched, kicked, bitten, spit on in the face, and hit by his peers.  His mother explained that her son would "usually . . . come[] home" from school with "dry tears in his eyes."  On one occasion, Nicholas "came home with a knot so huge on his knee that he should have been brought to the nurse."  His father testified that he and his wife would see black-and-blue marks on their child's body.

---

[1] Throughout this opinion, given the procedural posture of the case, I present and "constru[e] the evidence in the light most favorable to the [plaintiff] and draw[] all reasonable inferences in [her] favor."  *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005).

1

Despite this striking evidence, the majority concludes that no reasonable jury could possibly find that this young boy's teacher knew that the physical abuse this young boy suffered at the hands of his classmates, aside from the slapping incident, was racially motivated because the teacher was never explicitly told that the students who abused Nicholas did so because he was black and because there were no other circumstances that could possibly have made clear to this teacher that the abuse was motivated by his race. I disagree.

While the majority dismisses the repeated physical abuse at issue in this case as "commonplace" and "routine," Majority Op. at 42, I believe that a jury could conclude that the serious and sustained abuse allegedly suffered by this little boy was anything but ordinary. Moreover, his teacher had specifically been told on multiple occasions that this particular child—the only black child in his class—had been called vicious racial epithets by his classmates, and on one occasion had even been told that a girl in his class slapped him in the face and called him a racial slur. In other words, Uccello had been told that the racially-motivated verbal abuse had, at least on one occasion, escalated into a physical assault.

In this context, I believe a jury could conclude that this boy's teacher did not need to be explicitly told that subsequent acts of physical abuse—which a jury might find were far from commonplace—were similarly motivated by the boy's race in order to conclude that he was in fact being harassed, both physically and verbally, because he was black. Put simply, I believe that a jury could find that this teacher used her common sense and connected the dots. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 n.6 (2d Cir. 1999) ("Of course, a showing that the defendant 'should have known' can, in some circumstances, create an inference—at least sufficient to raise a genuine issue—that the defendant *did* know.").

2

For the foregoing reasons, I am unable to agree with the majority's conclusion that no reasonable jury could find that Uccello was actually aware that the subsequent physical abuse Nicholas reportedly suffered, following the slapping incident, was racially-motivated. Accordingly, I do not believe that Uccello is entitled to qualified immunity from liability for deliberate indifference to either the verbal or the physical harassment allegedly suffered by Nicholas in kindergarten.[2]

---

[2] I assume, *arguendo*, as the majority does, that these defendants should be entitled to qualified immunity unless there is a genuine issue of material fact as to whether they were deliberately indifferent to racial harassment that was "severe, pervasive, and objectively offensive," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999), given our decision in *Gant* not to address the question of whether the standard articulated in *Davis* applied to claims that a student's constitutional rights under the Equal Protection Clause were violated, *see Gant*, 195 F.3d at 141 n.5 ("We need not—and do not—decide whether mere name-calling is insufficient in the equal protection setting as well . . . ."). Nonetheless, I believe that a reasonable jury could conclude that the subsequent physical abuse at issue here was sufficiently severe and pervasive within the meaning of *Davis*.